MEDICS, INC., et al., Plaintiffs,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.

Civ. No. 88–2120 (JAF).

United States District Court, D. Puerto Rico.

May 31, 1991.

Eduardo Morales–Coll, San Juan, P.R., for plaintiffs.

Fidel A Sevillano–del–Río, Asst. U.S. Atty., Daniel F López–Romo, U.S. Atty., D. Puerto Rico (Annette H. Blum, Chief Counsel and Robert Wanerman, Asst. Regional Counsel U.S. Dept. of Health and Human Services, of counsel), for defendant.

## OPINION AND ORDER

FUSTE, District Judge.

Plaintiffs are suppliers of "durable medical equipment." They receive reimbursement for the equipment they sell or lease through Part B of the Medicare Program. Part B of the Medicare program is a government sponsored and funded insurance plan. The Secretary of Health and Human Services (the "Secretary") is ultimately responsible for the implementation

of the plan, but has delegated day-to-day administration to local insurance carriers (the "carrier"). In this suit, plaintiffs challenge implementation of certain administrative operations letters published by both the Secretary and the carrier, which plaintiffs claim are substantive rules subject to the formal rule-making requirements of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the Social Security Act, 42 U.S.C. § 1395hh(a)(2). In addition, plaintiffs claim that the Secretary's interpretation of the effective date of the Omnibus Budget Reconciliation Act of 1987, which affects the basis on which the compensation for their services is calculated, is erroneous. Finally, they argue that certain of the methods used by the carrier to determine amounts reimbursable (so-called "gap-filling procedures") are in violation of law.

### *Structure of Part B*

Part B of the Medicare program, 42 U.S.C. §§ 1395c *et seq.*, is a voluntary insurance program financed in part from premiums paid by beneficiaries, and in part form government funds. It covers the costs, *inter alia,* of certain services which require the use of medical equipment. Part B is administered by insurance carriers who sign a contract with the Secretary. 42 U.S.C. § 1395u. In Puerto Rico, the carrier is Seguros de Servicios de Salud ("SSS"). The subdivision within the Department of Health and Human Services which directly oversees the program is the Health Care Financing Administration ("HCFA").

Part B benefits can be paid either to the beneficiary directly or, through an assignment by the beneficiary, to the provider directly. 42 U.S.C. § 1395u(b)(3)(B)(ii). A medical provider may choose to become a participating supplier, agreeing in advance to accept payment on an assignment basis for all items and services furnished to Part B beneficiaries during an entire year. 42 U.S.C. § 1395u(h)(1). A supplier/assignee has the same rights as the assigning beneficiary to pursue payment of the assigned claim. 42 C.F.R. § 405.801(a). Plaintiffs here are all participating suppliers who pro-

vide durable medical equipment ("DME"). 42 U.S.C. § 1395x(n).

Prior to January 1, 1989, payment for DME purchases or leases under Part B was calculated in a series of confusing and often improperly implemented ways. In order to simplify the process, Congress enacted section 4062(b) of the Omnibus Budget Reconciliation Act of 1987 ("OBRA 87") (DME sections are codified at 42 U.S.C. § 1395m(a)). OBRA 87 created a new system of fees to be applied by carriers to the reimbursement due to participating suppliers of DME. The new system provides that "[t]he amendments made by this section shall apply to covered items furnished on or after January 1, 1989."

The first of the two documents at issue in this dispute, Transmittal No. 1279, is an operations sheet issued by HCFA to guide carriers through the implementation of OBRA 87. The second document, Circular Letter # M–88–12–071, is a missive issued by SSS (the carrier) intended to provide DME suppliers with instructions on reimbursement under the new billing system.

### *Substantive or Interpretive?*

Plaintiffs claim that the material contained in the two publications amounted to substantive rules subjecting defendant to the full rule-making requirements of Federal Register notice and publication. Defendant claims, with one exception, that the two publications are merely interpretive, and need not go through formal rule-making. The exception, which defendants concede was subject to formal rule-making, but for which no formal rule-making was applied, was the definition of the word "continuous".

We start by noting that we could find no reported cases since the January 1, 1989 implementation of either the HFCA manual or the SSS Circular Letter in which a court had to entertain a challenge to those regulations on the grounds raised here. Although the challenged SSS letter applies only in Puerto Rico, the HFCA manual is a national publication.

 We therefore move on to general principles of administrative law. The Ad-

ministrative Procedure Act ("APA") itself limits its applicability to substantive rule-making, not interpretive, procedural, or general statements of agency policy. The relevant section of 5 U.S.C. § 553(b) provides that:

> Except when notice or hearing is required by statute, this subsection does not apply—
>
> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice;

The Social Security law itself has a publication requirement, but it also applies only to substantive rules. Section 1395hh states:

**(a) Authority to prescribe regulations; ineffectiveness of substantive rules not promulgated by regulation**

(1) The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter. When used in this subchapter, the term "regulations" means, unless the context otherwise requires, regulations prescribed by the Secretary.

(2) No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment fir services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

We think it clear that the Social Security Act does not impose on the Secretary any duty which he did not already have under the Administrative Procedure Act, in the sense that both require full rule-making only for *substantive* rules or policy changes. Plaintiffs offer no precedent to suggest that Social Security law is more demanding on the Secretary than the APA.

■ We go on to determine whether these rules (the conceded violation excepted) were substantive or not. "If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive." *Bailey v. Sullivan*, 885 F.2d

52, 62 (3rd Cir.1989). If it creates rights, assigns duties, or imposes obligations the basic tenor of which are not already outlined in the law itself, it is a substantive rule. *Ohio Department of Human Services v. United States Department of Health and Human Services, Health Care Financing Administration*, 862 F.2d 1228 (6th Cir.1988). As the District of Columbia District Court stated in interpreting cataract fee limitation provisions as set out by the Secretary pursuant to the specific directives of the 1986 OBRA, "[g]enerally it is agreed that legislative/substantive rules create law, often in implementing an existing statute, while an interpretive rule advises the public of its construction and the agency's interpretation of new or existing law and announces how the agency believes the statute should be enforced." *American Soc. of Cataract & Refractive Surgery v. Bowen*, 725 F.Supp. 606 (D.D.C. 1989).

■ Setting aside for a moment the question of the effective date of OBRA 87, and the question of the validity of the gap-filling procedures to calculate fees, issues to be covered later in the opinion, we find that neither challenged publication constitutes a substantive or legislative rule. The provisions of the APA requiring notice and comment under section 553 were not triggered. The statute itself in this case is extremely detailed and provides many specific directives that were merely carried over into the Transmittal and Circular Letter, or were expanded there. The Transmittal, for instance, tracks the statute in issues such as "Items Requiring Frequent and Substantial Servicing" (found in the statute at 42 U.S.C. § 1395m(a)(3)), "Inexpensive or Other Routinely Purchased DME" (§ 1395m(a)(2)), and "Oxygen and Oxygen Equipment" (§ 1395m(a)(9)). The law limits the total length of time that monthly payments can be made on "Capped Rental Items" to fifteen months, and then sets up a system for implementing that substantive change. 42 U.S.C. § 1395m(a)(7)(A)(i). The two publications set out the specifics for making the proper calculations regarding the 15–month rule

and related ramifications. The Transmittal and the Circular letter do no more than explain or expand on, along with some plain language calculation hints, how to do the necessary calculations under the statute. In that sense they are like the Internal Revenue Service pamphlets on individual tax topics which help taxpayers to translate the IRS code into a language which can be applied on a tax form. We see no creation or diminution of rights or obligations set out in either of these documents which would lead us to conclude that they are anything other than interpretive rules.[1] Agency manuals have often been found by courts to constitute interpretive rather than substantive rules. *Linoz v. Heckler*, 800 F.2d 871 (9th Cir.1986); *Creighton Omaha Regional Health Care Corp. v. Bowen*, 822 F.2d 785, 791 (8th Cir.1987) ("provisions in the Provider Reimbursement Manual and amendments thereto are 'interpretive rules,' not subject to the rule-making process of section 553"); *St. Mary's Hospital of Troy v. Blue Cross and Blue Shield Assoc.*, 788 F.2d 888, 891 (2nd Cir.1986) ("manual rules have consistently been held to be 'interpretive rules,' and thus exempt from the notice and comment requirements"); *American Ambulance Services, Inc. v. Sullivan*, 716 F.Supp. 861 (E.D.Pa.1989), *reversed on other grounds*, 911 F.2d 901 (3rd Cir.1990). We find that, subject to the disposition of specific issues below, neither the APA nor the publication provisions of the Medicare law subjects these publications to notice and comment provisions.

*Publication under § 552 of the APA*

█ Even interpretive rules, though not subject to notice and comment requirements, must comply with the requirements of the Freedom of Information Act, codified at 5 U.S.C. § 552. That section requires the agency to publish in the Federal Register, *inter alia*, "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability for-

mulated and adopted by the agency." 5 U.S.C. § 552. The section goes on, however, to allow that some rules (those not covered in the above definitions) do not need to be published in the Federal Register, but need only be made otherwise available to the public:

§ 552(a)....

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

. . . . .

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in this Federal Register; and;

(C) administrative staff manuals and instruction to staff that affect a member of the public;

█ The First Circuit has specifically recognized that the APA describes in section 552(a)(2) a category of manuals and policy-interpretive rules that do not state the kind of general policy as contemplated by the publication requirement in section 552(a)(1)(D), but are instead merely required to be available to the public. *Capuano v. National Transp. Safety Bd.*, 843 F.2d 56 (1st Cir.1988); *Donovan v. Wollaston Alloys, Inc.*, 695 F.2d 1 (1st Cir.1982). The *Capuano* court rejected an argument that all agency rules fell into one of two categories, those that required *both* promulgation through formal rule-making processes *and* Federal Register publication on the one hand and those requiring just Federal Register publication on the other. The court in *Capuano* held that an FAA manual dealing with pilot sanctions fell into the category of materials which did not need to be published in the Federal Register at all, so long as made available to the public pursuant to section 552(a)(2). We see that the materials at issue here, again excepting the specific issues which we review in the following sections, fall into the same nonpublication category. These are very specific manuals relating to the very

---

**1.** Again, setting aside for the moment the specific sections objected to which we will take up separately.

technical application of one element in Part B of the Medicare program. These are not the kind of broad, general policy or interpretive pronouncements that trigger the Federal Register publication requirements. *Capuano* teaches that not every interpretive rule, merely because it will be applied evenly across the nation, rises to the level of an "interpretation[ ] of general applicability...." We follow the *Capuano* court in reserving that status for agency dations of a grander scale.

### *Definition of "Continuous"*

In 42 U.S.C. § 1395m(a)(7) the law states that: "The Secretary shall determine the meaning of the term 'continuous' in subparagraph (A)." The definition is required to give full meaning to the section of OBRA 87 which limits payment for capped rental items to a period of "continuous" use not to exceed fifteen months. The term was provisionally defined in the documents at issue here, but without formal notice and comment. Plaintiffs allege that the definition of that term by the Secretary amounts to the exercise of a grant of legislative authority, and that it was therefore a substantive rule subject to notice and publication requirements. The Secretary concedes that the rule is a substantive one. The Secretary concedes that a final rule must be published. The Secretary disagrees, however, about whether a formal notice and comment period was required for the rule. To this court's knowledge, that definition has yet to appear in any form other than in the documents at issue here. In any event, even if the rule were published tomorrow, it has not been subjected to a notice and comment period.[2]

Having conceded that the Secretary is legally obligated to issue a rule regarding the definition of the word "continuous", the Secretary urges this court to issue no relief to plaintiffs. The Secretary argues that since the plaintiffs had "actual notice" of the interim rule as published in the publications at issue, they can claim no "harm" in the failure of the Secretary to put the rule through notice and comment. Further, the Secretary argues that if the final rule is more generous to plaintiffs than the currently constituted rule, the Secretary will reimburse plaintiffs for the difference between what they would have been paid had the final rule been implemented as required.

 It is true that the APA relieves the Secretary of the duty to publish a notice of proposed rule-making in the Federal Register where persons subject to the rule have actual notice of it.

§ 533. **Rule Making**

. . . . .

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

It would seem that the Secretary holds up the definition of the word "continuous" in the Transmittal and the Circular Letter as the *actual* notice of proposed rule-making required in the statute, obviating the need for a formal Federal Register publication. While we agree that the plaintiffs, by their own admission, had actual knowledge of the contents of the Transmittal and Circular, we fail to see how those documents satisfied the requirements of stating the

---

**2.** For a time the Secretary begged indulgence by the court on the promise that the rule was soon to be published. In an affidavit dated March 21, 1990, Charles R. Booth, Director of the Office of Payment Policy, Bureau of Policy Development, HCFA, swore that the Secretary was drafting regulations defining the term "period of continuous use" and that they would be published as soon as they were available. On May 30, 1990, the Secretary filed an Informative Motion telling the court that the Secretary planned to publish the definition in the form of an Interim Final Rule with Comment Period in July 1990.

"[t]ime, place, and nature of public rule making proceedings...." Technical requirements of section 553 aside, it is clear that whatever else the notice must contain, it must be a clear initiation of public comment, and it must be followed up by the agency providing "interested persons an opportunity to participate in the rule making" (§ 553(c)) in the manner provided by law.

Neither of the documents at issue does any more than provide a definition of "continuous". Neither document even hints that the definition was being subjected to rule-making or that comments or other submissions would be entertained. In fact, the Secretary denies that any such notice and comment rule-making is required. Since the Secretary points to no notice other than these to satisfy its burden under the initial "[g]eneral notice of proposed rule making" requirement, we cannot find that the Secretary adequately initiated a comment period as required by law.

 We see no saving grace in the fact that the Secretary was authorized by Congress to implement the rule temporarily through interim regulations.[3] The right to issue *interim* regulations does not seem to us to lessen the Secretary's duties with respect to calling for comments on the issuance of the *final* rule. Defendant asserts that: "[s]ince Congress expressly authorized the issuance of regulations on an interim basis, all that plaintiffs were entitled to prior to the regulations going into effect is notice. Therefore, as long as the plaintiff had actual notice, the absence of a formal opportunity to comment on proposed regulations, prior to their effectuation, does not constitute a valid basis for challenging the regulations." (Docket Document No. 29, p. 23). We disagree.

Although it is nowhere clearly stated, it appears that defendant's justification for sidestepping rule-making lies in the Social Security Act itself. The section which requires the Secretary to promulgate substantive rules only through notice and comment, and to initiate the notice and comment through publication in the Federal Register, contains an exception. The relevant section reads as follows:

**(b) Notice of proposed regulations; public comment**

(1) Except as provided in paragraph (2), before issuing in final form any regulation under subsection (a) of this section, the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon.

(2) Paragraph (1) shall not apply where—

**(A)** a statute specifically permits a regulation to be issued in interim final form or otherwise with a shorter period for public comment.

42 U.S.C. § 1395hh.

The Secretary would have us read paragraph two as completely exempting any rule for which Congress authorizes an interim implementation from notice and comment, even prior to the ultimate publication of that rule as a *final rule*. We read the section differently. We think paragraph two merely authorizes the Secretary to bypass the usual publication requirements for purposes of the publication of the interim rule *qua* interim rule, but that the final rule must still, consistent with the APA, go through a notice and comment period prior to publication as a final rule. Of course the publication of the interim rule, as long as accompanied by a call for comment, can coincide with the initiation of the comment period. In that way, consistent with both the APA and the SSA, the Secretary can publish the interim rule in a manual such as the one at issue here, so long as the call to comment is also included. Both the APA and the SSA allow the Secretary to avoid the initial Federal Register publication, but neither, in our opinion, allow the Secretary to ignore the comment period

---

**3.** Section 4039(g) of OBRA 87 provided in full as follows:

USE OF INTERIM FINAL REGULATIONS— The Secretary of Health and Human Services shall issue such regulations (on an interim or other basis) as may be necessary to implement this subtitle and the amendments made by this subtitle.

entirely. We cannot agree that paragraph two overrides the APA. It is not logical to assume that merely because Congress sees the pressing need to have some interim rule enacted necessarily means that Congress wishes to exempt all such rules, at the stage of their review for implementation as final rules, from comment. In fact, the opposite is more reasonable. Those issues which are so critical as to require immediate action in the form of interim rules are likely to be in areas of hottest dispute, and consequently the areas where robust public debate and comment would be most desirable.

To summarize, we agree that the Secretary in this matter was justified in publishing the interim rule at issue here in the Transmittal and Circular Letter rather than in the Federal Register, since the APA is satisfied with "actual notice" and the SSA exempts interim rules from Federal Register publication. However, the publication of the interim rule should have been accompanied by the notice of the initiation of a comment period, followed by the receipt and review of comments, *after which* the final rule could have been published taking the public comment into account. The actual procedure employed in the case at bar has been an attempt by the Secretary to skip the comment period in derogation of his legal obligations.

■ We believe that the plaintiffs have a clear right to relief, that the Secretary has a plainly defined duty under the APA to promulgate this regulation through notice and comment, and, considering that the Secretary at present intends to publish the final rule without notice and comment, no other remedy is available. We therefore find that mandamus is appropriate. *Cervoni v. Secretary of Health, Education and Welfare*, 581 F.2d 1010, 1019 (1st Cir.1978).

To remedy the situation, we order the Secretary to conduct an expedited comment period prior to the publication of the final rule. Within thirty (30) days the Secretary will publish a notice asking for comment in a manner not inconsistent with the provisions of APA section 553. The period in which to submit comments will be forty-five (45) days after publication of the initial notice. The Secretary will have thirty (30) days thereafter to publish the final rule in the Federal Register. No deviation from this time schedule, except upon a showing of extreme hardship, will be entertained. Since the Secretary has been assuring this court for more than two years that the final rule is nearly finished, we think this time schedule is sufficient to allow the Secretary to take into account the solicited comments regarding the rule, and still publish the final rule in the time provided.

We understand, of course, that we may actually be prolonging the issuance of a final rule, assuming that the Secretary is in fact at the point of issuance. But it is not merely a final rule that plaintiffs want and are entitled to, it is a final rule issued after the notice and comment procedure required by law. In the meantime, the interim regulation will remain in effect. We can see no value in disrupting the entire industry by invalidating the interim rule on the theory that its "interimness" has worn out.

### Effective Date of OBRA 87

■ The question of how the effective date of OBRA 87 is to be applied is a question of statutory interpretation. The statute reads as follows:

EFFECTIVE DATE—The amendments made by this section shall apply to covered items furnished on or after January 1, 1989.

Pub.L. No. 100–203, § 4062(e).

The Secretary interprets this language to mean that the new payment system applies to all claims for DME which are for *service* in the form of equipment provided on or after January 1, 1989, regardless of when the equipment was first supplied to the beneficiary. Therefore, if a kidney machine was first provided by plaintiffs on a rental basis in October 1988, the rental payments starting January 1, 1989 would be calculated under the new law. Plaintiffs claim that the law applies only to equipment provided to a beneficiary for the first time on or after the relevant date. Therefore, the kidney machine used as an example would not be covered under the

new law. The plaintiff/provider would continue to bill for services rendered by that machine at the pre-OBRA 87 rates for as long as that machine continued to service the same beneficiary for which it was originally provided.

The language of the statute is ambiguous and reasonably admits either of the conflicting interpretations. "Furnished" may mean the original delivery and installment of the DME. On the other hand, one could say that the supplier "furnished" an oxygen machine in February 1989, even if that machine had been in continuous use by that same beneficiary for the two years prior to February of 1989.

We agree with the Secretary, however, that what legislative history there is points to the reading urged by the agency. The legislative history is replete with Congress' intention to simplify the system and to provide for uniformity.

> Suppliers have complained about the frequency of change in the payment rules, the lack of consistency and predictability in the application of policies, and long delays in payment. Carriers have expressed concerns about the complexity of the rules and the difficulty of making rent/purchase determinations.... The Committee bill would attempt to resolve these problems by completely restructuring the payment methodology for these items and services.

H.R.Rep. No. 391(I), 100th Cong., 1st Sess. 390–91, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–210, 2313–211.

A reading which simplifies the program by applying the same payment schedule to all equipment being supplied on or after a date certain seems more consistent with the general goal of simplification than one which has some payments under the new system, and some under the very confusing old system. We read the statute in the same way as the Secretary. We think in using the word "rendered" in the Transmittal and Circular Letter when describing the concept of "furnished" (the ambiguous wording of the statute) the Secretary was doing no more than clarifying his own interpretation of the law. Since we agree with that interpretation, we see nothing infirm about the Transmittal or Circular Letter with regard to this issue.

### Gap–Filling Procedures

■ The statute provides for a detailed set of calculations to be made by the carrier to determine payment amounts for DME. Alternatively, if after the calculations have been made it appears that the actual charge for the item (presumably the "price" at which the supplier would offer the DME to a private purchaser) is lower than the calculated price, the price to be paid is the actual price. 42 U.S.C. § 1395m. The statute provides that this system is the exclusive manner in which payment shall be determined. § 1395m(a)(1)(C). Since this is a challenge to the legality of regulations themselves (rather than the misapplication of valid regulations), we have jurisdiction over this matter. *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).

In the challenged publications, the Secretary has carried over the calculation requirements from the statute. In addition, as is a standard practice, the Secretary has provided "gap-filling procedures," special steps to be followed by the carrier while making the calculations to "fill-in" gaps caused by raw data which is unavailable. Plaintiffs acknowledge that at times not all information necessary to make the calculations exactly as set out in the law will be available. Plaintiffs claim that the solution for the carrier in those cases is to pay the "actual charge," since, according to plaintiffs, that is the only alternative payment amount contemplated by the statute. Plaintiffs claim that the gap-filling procedures contravene the law, in that they create a method for calculation not contemplated by the statute. Alternatively, they claim that the gap-filling procedures are substantive rules requiring rule-making. We disagree.

We think plaintiffs mischaracterize the gap-filling methods. Rather than being a "different" calculation method, we see

them as the Secretary's best attempt to help carriers arrive at the payment amounts as set out in the statute. A simplified illustration will help. Suppose a statute allows the government to reimburse car dealers for cars purchased for government use. The statute says that the payment amount will be:

The lower of either:

a. the actual sticker price, or;

b. the average sticker price for that model based on data from the area for the last six months of 1990.

Assume then, that last year's sticker price information is not available, but that factory-to-dealer average prices are available, as are average dealer mark-up rates. The agency charged with implementing the law issues a regulation as follows:

Gap–Filling Procedure

Where 1990 sticker price information is unavailable, or is only available from less than 5% of all dealers, calculate the average sticker price for the last six months of 1990 by calculating the average factory-to-dealer prices and adding average dealer mark-ups for the relevant period.

In our simplified example we can see that although the gap-filling procedure does not in fact rely directly on the exact information set out by the statute, it is drafted by the agency to approximate the statutory requirements as closely as possible. Moreover, it is much more likely to accurately reflect the intent of the Congress passing our hypothetical Auto Acquisition Act than would a simple resort to the "actual price." In the illustration, as in the case at bar, we see the "lesser of …" provision in the statute as a manner of insuring that the government is never put in the absurd position of paying more, by virtue of its price formulas, than would a consumer walking in off the street. We do not think that it was intended to provide the catch-all price which would be applied whenever the carrier encountered a snag in calculating the price formula.

We view the gap-filling provisions as a form of interpretation of the statute, an interpolation necessary to fill in where numbers are missing. In that sense, we see it as an interpretive rather than substantive rule, exempting it from the notice and comment provisions.

Of course the gap-filling procedures must produce a result that does in fact strive towards an implementation of Congressional intent in that it aids in arriving at the statutorily-contemplated level of reimbursement. We can well imagine that gap-filling procedures, unartfully drawn, could deviate so substantially from the law as to pass out of the realm of "interpretation" and pass into the realm of illegality. Here, however, that is not plaintiffs' argument. They categorically deny the right of the Secretary to implement these procedures at all, and instead insist on the right to collect the "actual" price (undoubtedly higher) wherever full data is unavailable. We believe that the Secretary's gap-filling procedures come much closer to directly tracking and following the statute than would a resort to "actual" price. We find the gap-filling procedures to be fully enforceable.

### Conclusion

This matter comes to us after an order of this court, based on agreement of the parties, that the matter would be submitted on cross-motions for summary judgement. The material facts, as described throughout this order, are not in dispute. We therefore rule on all issues on the merits.

1. With the exception of the relief granted in paragraph 2, plaintiffs' motion to invalidate the Secretary's Transmittal No. 1279 and the carrier's Circular Letter # M–88–12–071, or to require that those documents be submitted to a notice and comment period, is hereby DENIED.

2. Plaintiffs' motion for a writ of mandamus to require the Secretary to notice for comment a final rule on the definition of the word "continuous" as used in 42 U.S.C. § 1395m(a)(7) is hereby GRANTED to the following extent: The Secretary is ordered to publish a notice soliciting comment in a manner not inconsistent with 5 U.S.C. § 553 within thirty (30) days. The comment period will be for forty-five (45) days following publication of the notice.

The Secretary will have thirty (30) days thereafter to publish a final rule in the Federal Register.

3. Plaintiffs' motion, so far as it seeks to invalidate the currently effective interim rule defining the word continuous, is DENIED.

4. Plaintiffs' motion seeking to invalidate the Secretary's interpretation of the effective date of the pricing plan under OBRA 87 is hereby DENIED.

5. Plaintiffs' motion seeking to enjoin the Secretary from calculating payment amounts on the basis of "gap-filling procedures" is DENIED, and their motion seeking to force the Secretary to promulgate such procedures pursuant to formal rulemaking is DENIED.

6. The complaint, with the exception of that portion seeking the relief granted in paragraph 2, is hereby DISMISSED in its entirety, and all motions by defendant not inconsistent with the relief granted in paragraph 2 are deemed GRANTED.

IT IS SO ORDERED.