11 F.3d 186
 304 U.S.App.D.C. 142
 Jose A. ORENGO CARABALLO; Wilfred Santiago Santiago;
Comite De Apoyo A Los Trabajadores Agricolas
(CATA), Appellants,
v.
Robert B. REICH, Secretary of Labor; Thomas Hill, Regional
Administrator of the Employment and Training Administration,
United States Department of Labor; United States Department
of Labor; Immigration & Naturalization Service; Janet
Reno, United States Attorney General, Appellees,
S & A Chaissan and Sons; W.G. Minard & Sons; Minard Farms,
Inc.; Stanley Orchards; W.H. Walker and Sons;
Dembroski Orchards, Inc., Intervenor-Appellees.
 No. 93-5225.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 8, 1993.
Decided Dec. 10, 1993.
 
 [304 U.S.App.D.C. 144] Appeal from the United States District Court for the District of Columbia (Civil Action No. 92cv02863).
 [304 U.S.App.D.C. 145] Dan Getman argued the cause for appellants. With him on the briefs were Bruce Goldstein and Shelley Davis.
 Harry L. Sheinfeld, Counsel, U.S. Dept. of Labor, argued the cause for appellees. With him on the brief were J. Ramsey Johnson, U.S. Atty., John D. Bates, R. Craig Lawrence and Thomas S. Rees, Asst. U.S. Attys.
 On the brief for intervenor-appellees, S & A Chaissan and Sons, et al., were Thomas E. Wilson and Christopher A. Weals.
 Before WALD, GINSBURG, and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 Appellants, two migrant farmworkers, Jose A. Orengo Caraballo and Wilfred Santiago Santiago, and an organization supporting farmworkers, Comite De Apoyo A Los Trabajadores Agricolas (collectively "CATA"), appeal from the district court's entry of summary judgment for appellees, the Department of Labor, the Department of Justice, and the Immigration and Naturalization Service (collectively "DOL" or "Department")[1] in Orengo Caraballo v. Reich, No. 92-2863, 1993 WL 542456 (D.D.C. June 30, 1993).
 
 
 2
 The centerpiece of this case is a fairly complicated loan arrangement through which Jamaican migrant farmworkers receive loans to cover travel expenses for their journey from Kingston, Jamaica to apple orchards in New York for seasonal employment. Appellants had filed an administrative complaint with the Secretary of Labor, requesting that the DOL require New York apple growers to provide similar travel advances and arrangements for U.S. migrant farmworkers who must travel from Puerto Rico to the growers' orchards for work.
 
 
 3
 The U.S. farmworkers alleged that the growers are required under the temporary foreign worker certification program, or "H-2A" program, 8 U.S.C. Secs. 1101(a)(15)(H)(ii)(a), 1184(c) & 1188; 20 C.F.R. Part 655, to provide these travel benefits to U.S. workers, because the growers are "collaborating" with third parties providing advance benefits to inbound Jamaican workers. The Department agreed that the growers must extend "no less than the same benefits" to domestic workers as are afforded foreign workers, 20 C.F.R. Sec. 655.102(a) (1993), and that, in particular, growers "shall advance transportation and subsistence costs ... to [domestic] workers ... when such benefits are extended to [foreign] H-2A workers," id. at Sec. 655.102(b)(5)(i). Letter from Lynn Martin, Secretary of Labor, to Bruce Goldstein, Farmworker Justice Fund, Inc. ("FJF") (Oct. 9, 1991) (with Enclosure of DOL Response to FJF Complaint), reprinted in Joint Appendix ("J.A.") at 2. However, it decided that the growers' "collaboration" in the current loan scheme did not constitute an "advance" of transportation costs to Jamaican workers, because the growers do not bear any "risk of loss" in the event that the Jamaican workers default on their loan obligations. The DOL concluded that in the case of this loan scheme, the growers' "collaboration" with third parties is insufficient to trigger any obligation under the H-2A program on the part of the growers to advance transportation costs to domestic workers. It denied the complaint in part, requiring only that the growers offer to provide travel arrangements for U.S. workers and cooperate with any domestic third parties willing to offer a similar loan arrangement to U.S. workers, while declining to require that the growers themselves advance travel costs to domestic workers.
 
 
 4
 The U.S. farmworkers brought an action in district court challenging the Secretary of Labor's final determination under Sec. 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 706(2)(A). The district court held that the DOL's reliance on the risk of loss standard was both rational and consistent with written regulations, and that the application of the risk of loss standard in deciding petitioners' complaint was neither arbitrary, [304 U.S.App.D.C. 146] capricious, nor otherwise contrary to law. CATA appeals from the district court's entry of summary judgment in favor of the appellees. For reasons set forth below, we affirm the district court.
 
 I. REGULATORY BACKGROUND
 
 5
 Under the H-2A program, established by the Immigration and Nationality Act, Pub.L. No. 82-414, 66 Stat. 163 (1952), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99-603, Sec. 301, 100 Stat. 3359, 3411 (codified at 8 U.S.C. Secs. 1101(a)(15)(H)(ii)(a), 1184(c) & 1188), employers who are unable to find sufficient U.S. agricultural labor may apply for permission to recruit and employ foreign workers for temporary employment in the United States. In order for the Attorney General (via her designate, the Commissioner of the Immigration and Naturalization Service, 8 C.F.R. Sec. 100.2) to approve such a request for alien importation under the H-2A program, the employer must first petition the Secretary of Labor to certify that:
 
 
 6
 (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
 
 
 7
 (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.
 
 
 8
 8 U.S.C. Sec. 1188(a). See id. at Sec. 1188(c)(1). The H-2A program is thus designed to balance two competing interests: "to assure [employers] an adequate labor force on the one hand and to protect the jobs of citizens on the other." Rogers v. Larson, 563 F.2d 617, 626 (3d Cir.1977) (footnote omitted), cert. denied and appeal dismissed, 439 U.S. 803, 99 S.Ct. 57, 58 L.Ed.2d 95 (1978). See Flecha v. Quiros, 567 F.2d 1154, 1156 (1st Cir.1977), cert. denied, 436 U.S. 945, 98 S.Ct. 2846, 56 L.Ed.2d 786 (1978).
 
 
 9
 In order to ensure that there is an actual labor shortage, employers are required to recruit U.S. workers by circulating job offers through the United States Employment Service system, 29 U.S.C. Secs. 49-49l-1, an interstate network using state employment services to communicate job opportunities throughout the United States, and independently to engage in "positive recruitment efforts within a multi-state region of traditional or expected labor supply," 8 U.S.C. Sec. 1188(b)(4). See 20 C.F.R. Sec. 655.105 (1993). The Regional Administrator of the Employment and Training Administration of the Department of Labor will certify that the employer may hire sufficient temporary foreign workers to fill remaining needs based on whether the employer has made sufficient recruitment efforts and whether the employer has not adversely affected U.S. workers by offering foreign workers better conditions of employment than extended to U.S. workers. 20 C.F.R. Sec. 655.92 (1993). In making that determination, the Regional Administrator is guided by the following regulations. Generally,
 
 
 10
 [t]he employer's job offer to U.S. workers shall offer the U.S. workers no less than the same benefits, wages, and working conditions which the employer is offering, intends to offer, or will provide to [foreign] H-2A workers. Conversely, no job offer may impose on U.S. workers any restrictions or obligations which will not be imposed on the employer's H-2A [foreign] workers.
 
 
 11
 Id. at Sec. 655.102(a). Similarly, on the level of recruitment, the employer's efforts to recruit U.S. workers "shall be no less than ... the kind and degree of recruitment efforts which the potential H-2A employer made to obtain H-2A workers." Id. at Sec. 655.105(a). "[I]f the worker completes 50 percent of the work contract period," the employer must also reimburse the worker for transportation costs incurred in traveling from the place of recruitment to the place of employment (i.e., "inbound" travel) and pay for certain return transportation costs (i.e., "outbound" travel). Id. at Secs. 655.102(5)(i) & (5)(ii).
 
 
 12
 Specifically with respect to inbound travel advances, the original regulations promulgated in 1978 additionally provided:
 
 
 13
 if the employer intends to advance transportation costs to foreign workers either directly or indirectly (by having them paid by the foreign government involved), the [304 U.S.App.D.C. 147] employer must offer to advance the transportation costs of U.S. workers.
 
 
 14
 43 Fed.Reg. 10,306, 10,314 (1978) (codified at 20 C.F.R. Sec. 655.202(a) (amended 1987)). When issuing these regulations the DOL explained:
 
 
 15
 Employers will be required to offer and pay advance transportation and subsistence costs to U.S. workers if, and to the same extent that, foreign workers receive such advances directly from the employer or indirectly from any person, agency or other entity which is collaborating with the employer.
 
 
 16
 Id. at 10,308. The current H-2A regulations concerning travel advances were promulgated pursuant to the IRCA in 1987 and contain language somewhat different from the original regulations which were in effect until 1986. In particular, the current regulations omit specific reference to indirect travel advances:
 
 
 17
 The employer shall advance transportation and subsistence costs (or otherwise provide them) to workers when it is the prevailing practice of non-H-2A agricultural employers [i.e., employers of U.S. agricultural workers] in the occupation in the area to do so, or when such benefits are extended to H-2A [foreign] workers.
 
 
 18
 20 C.F.R. Sec. 655.102(b)(5)(i) (1993). In 1990, a group of U.S. farmworkers challenged this change in regulations under the APA, arguing that it constituted a substantive change in policy that was unreasoned and without appropriate notice and opportunity for comment. Jean v. Dep't of Labor, No. 89-0611, 1990 WL 515163, 1990 U.S.Dist. LEXIS 245 (D.D.C. Jan. 9, 1990) (memorandum order). However, the suit was ultimately dismissed as moot, because the DOL disclaimed any intention of substantively departing from the 1978 regulations and issued a statement vowing to apply the current regulations "as if the language in the predecessor regulation, which was codified at 20 C.F.R. Sec. 655.202(a) (1986), and which addressed the 'indirect' advancement of transportation costs, had not been deleted." 54 Fed.Reg. 35,730, 35,731 (1989). See Jean v. Dep't of Labor, 1990 WL 515163
 
 
 19
 6, 1990 U.S.Dist. LEXIS 245,
 
 
 20
 at * 17. Therefore, in considering petitioners' current challenge that New York apple growersindirectly advance travel and subsistence costs to Jamaican H-2A workers, we must remain mindful not only of the regulatory language as currently written, but also as it existed prior to the 1987 revisions.
 
 II. THE JAMAICAN LOAN ARRANGEMENT
 
 21
 While the H-2A regulations require employers to reimburse migrant farmworkers for their inbound travel upon completion of half of their work period, and New York growers promise all workers reimbursement for their inbound travel costs fifteen days into the harvest, farmworkers still face the significant hardship of having to bear transportation costs until receiving reimbursement by the employer. Since 1977, a complex loan arrangement among East Coast apple growers, the West Indies Central Labour Organization ("WICLO"), the National Commercial Bank of Jamaica ("Bank"), and the Florida East Coast Travel Service, Inc. ("FLECTS"), has enabled Jamaican farmworkers to pay for their inbound journey from Kingston, Jamaica to New York apple orchards for employment. See generally Affidavit of Joseph P. Russo, President of Pat Russo & Son, Inc. and Executive Vice President of the Valley Growers Cooperative, Inc., reprinted in J.A. at 270; Affidavit of Craig T. Titterud, Executive Director and General Manager of FLECTS, reprinted in J.A. at 313.
 
 
 22
 New York apple growers file applications for the employment of temporary H-2A workers with the DOL in anticipation of labor shortages for the upcoming season. A growers' cooperative prepares a master list of pre-screened Jamaican workers whom the growers wish to employ, and sends this list to WICLO, the Jamaican government's agent in matters concerning the employment of Jamaican H-2A workers, and to FLECTS, the growers' travel coordinator. If the DOL determines that there is indeed a labor shortage, that the employer has engaged in sufficient recruitment efforts, and that the importation of alien labor will not adversely affect U.S. workers, it will certify the applications for sufficient foreign workers to fill the employer's labor needs. These applications are sent to the INS for approval of temporary [304 U.S.App.D.C. 148] entry and work permits. Once approved, the INS in Miami informs FLECTS, which, in turn alerts the Jamaican Ministry of Labour, and arranges for transportation with Air Jamaica and Greyhound.
 
 
 23
 The Ministry of Labour notifies the workers to report at the final processing center in Kingston, Jamaica where the workers have the option of executing a promissory note with the Bank in order to receive a loan in the amount of travel costs and subsistence expenses for their northbound journey. Prior to departure from Kingston, the Bank collects from each worker the interest it charges on his loan. In addition, the worker executes an assignment authorizing the employer to remit the reimbursement for travel and subsistence costs directly to the Bank in order to repay the worker's loan exclusive of interest. Until 1990, FLECTS also was empowered to execute on the employers' behalf a tripartite agreement among the worker, the Jamaican government, and the employer. Since then, however, the growers have abandoned the use of the tripartite agreement in favor of three separate agreements: one between the worker and the Jamaican government, another between the worker and the grower, and a third between the growers' cooperative and WICLO. FLECTS prepares a manifest indicating each worker's name, identification number, employer, and travel information. FLECTS provides one copy of this manifest to the Jamaican government in lieu of departure cards, and presents another copy to the Bank together with an invoice for airfare, busfare, and subsistence. The workers then board the planes to Miami where they receive a subsistence allowance and board northbound buses.
 
 
 24
 The Bank issues a check to FLECTS to cover the travel costs. Fifteen days into the harvest, the growers remit each worker's travel reimbursement directly to the Bank which applies the money to the worker's outstanding loan. Finally, FLECTS pays the carriers thirty days after the carriers provided travel services to the workers. The agreement between FLECTS and the growers expressly requires FLECTS to "[a]ssure that all costs of transportation, subsistence, and any other expenses associated with in-bound movement of West Indian workers be paid for by the West Indian workers and not, under any circumstances, by the [apple growers], any West Indian Government, or [FLECTS], either directly or indirectly." West Indian Worker Transportation Agreement and Power of Attorney ("Agency Agreement"), at p. 2 p 2(e), reprinted in J.A. at 332, 333. See Affidavit of Craig T. Titterud, at p. 7 p 14 (J.A. 319).
 
 
 25
 III. THE DOL'S DENIAL OF PETITIONERS' COMPLAINT
 
 
 26
 The Department declined to require the growers to provide transportation advances to domestic farmworkers because, according to the DOL, the growers did not bear any risk of loss in the Jamaican loan arrangement and therefore could not be said to advance transportation costs to Jamaican H-2A workers either "directly or indirectly" within the meaning of the regulations. Letter from Lynn Martin (J.A. 2). It reasoned that the growers do not bear the loss in the event that the worker does not complete 50% of the harvest, i.e., the point where the burden to bear the inbound transportation costs shifts to the employer. In the event the worker does not complete sufficient work in order to become eligible for reimbursement for inbound travel costs, the assignment by which the worker authorized the employer to transfer the reimbursement directly to the Bank would become inoperative, leaving the Bank to bear the loss of the disbursed loan. See id. at Enclosure p. 2 (J.A. 4). CATA appeals this decision, arguing first that the Department's "risk of loss" test is unreasoned, in violation of written regulations, and contrary to agency precedent; second, that even if a "risk of loss" analysis were permissible, the growers participating in the loan arrangement do bear the risk of loss and therefore must be regarded as having advanced transportation costs within the meaning of the regulations; and finally, that the thirty day delay in payment of the carriers constitutes an outright advance by the growers to the Jamaican workers. We reject each contention.
 
 
 27
 We approach the Department's decision with due deference to its interpretation [304 U.S.App.D.C. 149] of statutes and regulations whose enforcement has been committed to the DOL. See Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). While we require the DOL to offer a reasoned analysis including a rational connection between the facts found and the decision made, we do not sit in review to substitute our judgment for that of the agency. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); National Treasury Employees Union v. Horner, 854 F.2d 490, 498 (D.C.Cir.1988). Of course the agency may not violate its own regulations, Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974), nor would we uphold an agency's interpretation that would be " 'inconsistent with the regulation [itself],' " Udall, 380 U.S. at 16-17, 85 S.Ct. at 801 (quoting Bowles v. Seminole Rock Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).
 
 A. The Risk of Loss Test
 
 28
 CATA's first argument relies principally on the two above-cited passages in the 1978 regulations. One requires employers to advance travel costs to domestic workers if "foreign workers receive such advances directly from the employer or indirectly from any person, agency or other entity which is collaborating with the employer." 43 Fed.Reg. at 10,308. The second compels the employer to advance travel costs "if the employer intends to advance transportation costs to foreign workers either directly or indirectly (by having them paid by the foreign government involved )." 20 C.F.R. Sec. 655.202(a) (1986) (emphasis added). CATA concludes that these regulations plainly require employers to advance transportation costs to domestic workers whenever the employer "collaborates" with any third party providing such benefits to foreign H-2A workers regardless of who bears the risk of loss of such advances. Appellants' Brief at 24-31. CATA claims that the risk of loss analysis used in dismissing the FJF complaint is arbitrary and capricious, as well as contrary to prior agency practice.
 
 1. Substantive APA Claim
 
 29
 CATA's argument loses sight of the overall purpose of the provisions which is to require employers to advance travel costs to domestic workers where the employer advances such costs--directly or indirectly--to foreign workers. See 20 C.F.R. Sec. 655.102(a) (1993) ("[t]he employer's job offer to U.S. workers shall offer the U.S. workers no less than the same benefits ... which the employer is offering ... to H-2A workers" (emphasis added)); accord id. at Sec. 655.105(a); 20 C.F.R. Sec. 655.202(a) (1986); H-2A Program Handbook, p. I-23 (Jan. 1988), reprinted in J.A. at 511, 512. We agree, therefore, with the DOL that even where the employer may be collaborating with third parties, the risk of loss analysis is a reasonable tool in order to determine whether there was an advance "by the employer" within the meaning of the regulations. Letter from Lynn Martin, at Enclosure p. 2 (J.A. 4) (emphasis in original). We believe that the DOL reasonably interpreted the meaning of an "advance" in light of the competing interests of U.S. labor and growers of perishable crops. It may rationally have concluded, for example, that the interpretation of the "collaboration standard" as envisioned by appellants would be "inappropriately burdensome on the employer," requiring as it would that employers fund travel advances out of their own pockets in cases where they were not advancing such costs to foreign workers. Id. See H.R.REP. NO. 682(I), 99th Cong., 2d Sess. 81 (1986) ("the Committee does not intend to impose unduly burdensome [recruitment] requirements upon the employer").
 
 
 30
 We reject as well appellants' insistence that the regulation on its face requires an employer to advance travel and subsistence costs whenever a foreign government advances such costs even if the employer bears no risk of loss. To be sure, when promulgating Sec. 655.202(a) in 1978, the DOL was in part reacting to a factual scenario then in place in which the employer would reimburse the Jamaican government fifteen days into the harvest for advancing travel costs. 43 Fed.Reg. at 10,308. That arrangement, [304 U.S.App.D.C. 150] not totally dissimilar to the Jamaican loan arrangement before us now, provided that (a) the Jamaican government itself--as opposed to a bank--extended the travel advances, and (b) the employers, by direct contractual agreement with the Jamaican government, promised to reimburse the government after the worker completed fourteen days of harvesting. In promulgating Sec. 655.202(a), the DOL sought to "clarify" its position by stating that it would require employers to advance travel costs to domestic workers where the employer advances such costs "indirectly" to foreign H-2A workers by "collaborating" with any entity, including a foreign government, that is furnishing the travel funds in advance to foreign workers. Id. In our view Sec. 655.202(a) as promulgated in 1978, together with its clarificatory statement containing the "cooperation" language, do not, however, trigger an employer's duty to advance transportation costs whenever a foreign government advances such costs to its citizens. The regulation requires that the employer "hav[e] ... [the travel advances] paid by the foreign government." 20 C.F.R. Sec. 655.202(a) (1986). Hence, we see no inconsistency between the old regulations and the DOL's current position that mere collaboration with a foreign government that advances travel funds to H-2A workers--without the grower bearing any economic risk--is insufficient to trigger an employer's duty to advance such costs to domestic workers. While perhaps the 1978 regulations could have more clearly articulated the precise point at which an employer's involvement in any collective scheme would trigger his duty to advance travel costs to domestic workers, we do not read the regulations as in any way inconsistent with the risk of loss test applied here to the agreement between the growers and the Jamaican bank.
 
 2. Procedural APA Claim
 
 31
 CATA argues next that even if the risk of loss test were reasonable, its use constitutes a departure from the agency's original "collaboration standard." In making this claim, CATA does not point to a single application of the "collaboration standard" as articulated by appellants, instead arguing that the DOL has never previously articulated the risk of loss standard as the controlling analysis in determining whether an employer has advanced travel costs to H-2A workers. See Appellants' Brief at 31-34. The DOL responds that it used the risk of loss analysis in a 1979 grand jury probe into the very loan arrangement currently being challenged, but that it cannot locate any written record of that investigation. Appellees' Brief at 34-35. In addition, the DOL claims to have employed a risk of loss analysis in dismissing a complaint under the H-2A regulations which was upheld in an unpublished case in 1985. See Brief for the Appellee U.S. Department of Labor, Paulk v. Virginia Agric. Growers Ass'n, Inc., No. 85-1793(L) (4th Cir. brief filed Dec. 1985), reprinted in J.A. at 539; see also Virginia Agric. Growers Ass'n, Inc. v. Donovan, Nos. 83-0146-D, 83-0147-D (W.D.Va. May 10, 1984) (order denying preliminary injunction), reprinted in J.A. at 8. Appellants argue that the DOL did not give the risk of loss analysis controlling weight in its decision to dismiss that 1985 complaint, and instead that the DOL in that case primarily looked to the degree of collaboration among the employer and third parties. Appellants' Brief at 32-34.
 
 
 32
 Even if the DOL failed previously to articulate the risk of loss test as clearly as it did here, we find the risk of loss test to be a permissible interpretation of the DOL's regulations and exempt from the notice and comment requirements of Sec. 553 of the APA. The APA requires in relevant part:
 
 
 33
 (b) General notice of proposed rule making shall be published in the Federal Register.... Except when notice or hearing is required by statute, this subsection does not apply--
 
 
 34
 (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice
 
 
 35
 ....
 
 
 36
 5 U.S.C. Sec. 553(b). The distinction between rules or statements which are subject to the notice and comment requirements of Sec. 553 and rules or statements which are exempt from those procedures is notoriously "hazy." American Hospital Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C.Cir.1987). See, e.g., General [304 U.S.App.D.C. 151] Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C.Cir.1984) (distinction " 'enshrouded in considerable smog' " (quoting Noel v. Chapman, 508 F.2d 1023, 1030 (2d Cir.1975))), cert. denied, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). Mindful of congressional intent in creating the APA and the " 'salutary purposes behind the [APA's] provisions,' " we have been careful to construe Sec. 553(b)(A)'s exceptions to the rulemaking requirements narrowly. American Hospital Ass'n, 834 F.2d at 1044-45 (quoting National Ass'n of Home Health Agencies v. Schweiker, 690 F.2d 932, 949 (D.C.Cir.1982), cert. denied, 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983)). Nonetheless, we employ certain principles in determining whether a rule or statement is "interpretative," a "general statement[ ] of policy," or sets out "rules of agency organization, procedure, or practice." 5 U.S.C. Sec. 553(b)(A). Cf. American Hospital Ass'n, 834 F.2d at 1045-48 (discussing different functions of "interpretative rules," "general policy statements," and "rules of agency organization, procedure or practice," as well as different principles for their respective identification); American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106 (D.C.Cir.1993) (distinguishing interpretive rules from general policy statements). Here, we focus on whether the DOL's risk of loss test employed in the course of an adjudication constitutes an "interpretative" statement and as such is exempt from the APA notice and comment requirements. Ultimately, an interpretive statement simply indicates an agency's reading of a statute or a rule. It does not intend to create new rights or duties, but only " 'reminds' affected parties of existing duties." General Motors, 742 F.2d at 1565 (internal quotes and citations omitted).
 
 
 37
 A statement seeking to interpret a statutory or regulatory term is, therefore, the quintessential example of an interpretive rule. See National Family Planning and Reproductive Health Ass'n v. Sullivan, 979 F.2d 227, 236 (D.C.Cir.1992). Especially in the course of an adjudication, the agency will give its understanding of the regulations with whose enforcement it is entrusted. At the very least it will explain its interpretation in order to permit the parties before the agency to understand its decision. If we were to require an agency to promulgate every regulatory or statutory interpretation arrived at in the course of adjudicating specific cases, agencies would be condemned to inactivity, since interpretation of the statutory and regulatory framework under which an agency must act is the sine qua non of reasoned agency action. Cf. American Mining Congress, 995 F.2d at 1111-12 ("Where a statute or legislative rule has created a legal basis for enforcement, an agency can simply let its interpretation evolve ad hoc in the process of enforcement...."). While we have said that interpretive rules "cannot go beyond the text of a statute," Fertilizer Inst. v. EPA, 935 F.2d 1303, 1308 (D.C.Cir.1991), we do not, of course, mean to imply that an interpretive statement may only paraphrase statutory or regulatory language. Indeed, a mere paraphrase would hardly be interpretive at all. Accordingly, an interpretive statement may "suppl[y] crisper and more detailed lines than the authority being interpreted" without losing its exemption from notice and comment requirements under Sec. 553. American Mining Congress, 995 F.2d at 1112 (holding Program Policy Letters that designate certain x-ray readings as "diagnoses" within meaning of agency's reporting regulations constituted interpretive rules exempt from rulemaking requirements under the APA). This is precisely what the DOL has done here.
 
 
 38
 The DOL was exercising its authority under the DOL's previously promulgated regulations. It found that the employer had not advanced transportation costs either directly or indirectly to foreign workers and consequently dismissed the FJF complaint. Since there had been an earlier grand jury probe which found that the Jamaican loan arrangement was not in violation of then-Sec. 655.202(a), and since petitioners were essentially challenging the same loan scheme in their current complaint, it made sense for the DOL to clarify and explain its understanding of a "direct or indirect advance." Indeed some interpretation of what constitutes an indirect advance was a prerequisite for the DOL to decide the FJF complaint at all. Appellants, however, argue that the risk of [304 U.S.App.D.C. 152] loss test was a departure from prior agency practice and must therefore be promulgated with notice and comment.
 
 
 39
 While in General Motors we did rely on the fact that the interpretive rule "simply restated the consistent practice of the agency," 742 F.2d at 1565, we do not require that all "interpretive" rules merely restate consistent agency practice. But see Comite De Apoyo Para Los Trabajadores Agricolas v. Dole, 731 F.Supp. 541, 544 (D.D.C.1990). To the contrary, in American Postal Workers Union v. United States Postal Service, 707 F.2d 548, 558-60 (D.C.Cir.1983), cert. denied, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984), we specifically held that the Office of Personnel Management's change in method for computing annuities was not subject to the rulemaking requirements under Sec. 553 because both the old and new methods were interpretive rules. Only where a " 'second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first[,] and ... must itself be legislative.' " National Family Planning, 979 F.2d at 235 (quoting Michael Asimow, Nonlegislative Rulemaking and Regulatory Reform, 1985 DUKE L.J. 381, 396) (holding agency's interpretation substantially repudiating earlier legislative rule that agency had defended against statutory and constitutional challenge before Supreme Court was legislative--not interpretative--rule) (first brackets in original) (emphasis added). A fortiori the mere absence of a prior definitive agency pronouncement of the interpretation of "direct or indirect advance" cannot serve as sufficient proof for the legislative character of its subsequent articulation. We hold that the DOL in this case did no more than give a reasonable meaning to the notion of a "direct or indirect advance" in the course of exercising its enforcement authority under the regulations. The risk of loss test is an interpretation of those regulations and as such is exempt from the requirements of the APA.
 
 
 40
 B. The Department's Application of the Risk of Loss Test
 
 
 41
 CATA asserts that the growers do bear a risk of loss in the Jamaican loan arrangement, essentially on the theory that FLECTS, as the employers' agent for purposes of inbound travel, must pay for travel costs regardless of whether FLECTS receives funds from the Bank. Appellants' Brief at 34-35; Appellants' Reply Brief at 14-19. The DOL's decision was based on its assessment that the Bank bears "the full risk of loss for any worker who does not complete 50 percent of the harvest." Letter from Lynn Martin, at Enclosure p. 2 (J.A. 4). In response to appellants' additional contention that a failure by the Bank to pay FLECTS, e.g., as a result of a bank failure, would place upon the growers the burden of paying the carriers for their service, the DOL maintains that any such bank failure would leave FLECTS--not the growers--with the burden of paying the carriers. We agree with the DOL's position.
 
 
 42
 As an initial matter, in the absence of a bank failure or similar extraordinary occurrence, the Bank pays FLECTS prior to receiving the assigned reimbursement from the growers. See Brief for Appellees S & A Chaissan & Sons, Inc., at 14 (citing Deposition of Craig T. Titterud, at p. 16 reprinted in J.A. at 127, 143). Therefore, the Bank will necessarily sustain the loss if the employer does not remit the assigned reimbursement on the basis that the worker has not completed the requisite amount of work.
 
 
 43
 And even if we entertain appellants' bank failure hypothetical, the loss still does not fall on the growers. Pursuant to the agency agreement between FLECTS and the growers (upon which appellants rely for their argument), FLECTS serves as the growers' "transportation coordinator." Agency Agreement, at p. 1 p 2(a) (J.A. 332). Contrary to CATA's assertion, FLECTS does not enter into "contracts between FLECTS and the carriers ... on [the growers'] account." Appellants' Reply Brief at 17. While "[a]n undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority," RESTATEMENT (SECOND) OF AGENCY Sec. 186 (1957); see id. at Sec. 144 (same for disclosed or partially disclosed principals), the agency agreement in this case cannot be read to convey authority to execute contracts with [304 U.S.App.D.C. 153] carriers on behalf of the employers. The agency agreement specifically requires FLECTS to "[a]ssure that all costs ... and ... expenses associated with in-bound movement of West Indian workers be paid for by the West Indian workers and not, under any circumstances, by the [growers], any West Indian Government, or [FLECTS], either directly or indirectly." Agency Agreement, at p. 2 p 2(e) (emphasis added) (J.A. 333). Thus while the terms of the contract require FLECTS to "[m]ake all necessary arrangements, including the negotiation and execution of contracts with such common carriers as are necessary to carry out the purposes of this agreement," id. at pp. 1-2 p 2(c) (J.A. 332-33), FLECTS would be overstepping its authority as circumscribed by p 2(e) were it to enter into such contracts with carriers on the growers' behalf. RESTATEMENT (SECOND) OF AGENCY Sec. 7 ("Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.") (emphasis added). Indeed, the affidavit of Craig Titterud (upon which appellants equally rely) explains:
 
 
 44
 ... FLECTS agrees to serve as transportation coordinator on behalf of the growers and to make all necessary arrangements to transport foreign workers from Jamaica to the place of employment in New York. FLECTS operates as an independent contractor and provides the services to the growers for a fee.
 
 
 45
 ... In order to provide transportation services to the growers, FLECTS enters into contracts in its own name with air carriers (including Air Jamaica) and ground carriers (including Greyhound). The growers are not parties to these contracts with the carriers. The payment terms are negotiated between FLECTS and the carriers. ... FLECTS must pay the carriers by the dates specified in the contracts regardless of whether FLECTS receives funds from the National Commercial Bank of Jamaica. The growers play no role in negotiating or setting the terms of these contracts.
 
 
 46
 Supplemental Declaration under Penalty of Perjury of Craig T. Titterud, p. 2 pp 2-3, reprinted in J.A. at 508, 509 (emphasis added). Thus there is no evidence in the record that under any reasonably imaginable scenario the growers bear the risk of loss in the event that any link in the loan scheme breaks down. We agree that the DOL's conclusion from these facts that the growers do not bear any risk of loss was reasonable.
 
 
 47
 C. The Thirty Day Delay in Payment of Carriers
 
 
 48
 Appellants' final contention that the growers advance travel costs directly to foreign workers by arranging for delayed payment of the carriers is similarly without bite. Appellants argue that U.S. workers do not enjoy the benefit of a thirty day delay in paying carriers for their travel services, but that FLECTS' arrangement with Air Jamaica and Greyhound for roughly a month's delay in payment constitutes just such a benefit extended by the employers to foreign workers. Appellants' Brief at 35-37. As intervenor-appellees aptly point out, there are several problems with this reasoning. See Brief for Appellees S & A Chaissan & Sons, Inc. at 17-18. First, CATA's argument is premised on attributing FLECTS' contractual dealings with the carriers to the growers--a supposition we have already rejected. This flaw in appellants' final contention suffices in itself to undermine the claim that the growers are extending credit to the workers in the form of a delayed payment of the carriers. Nonetheless, we note that CATA misconceives the basic nature of the credit being extended. In the first instance, the delayed payment is an extension of credit by the carriers to FLECTS. Only if FLECTS were to pass on this extension of credit to the workers could the argument be made that FLECTS was extending credit (obtained by use of its market power from the carriers) to the Jamaican workers. There is no evidence in the record that FLECTS passes on the delayed payment to the workers. By obtaining a loan (and paying the interest up front) the worker incurs the cost of the travel prior to departure from Kingston. Moreover, CATA's argument proves too much--a worker who paid FLECTS in cash for the journey prior to departure from Kingston would by CATA's [304 U.S.App.D.C. 154] reasoning, have received an "advance" for travel costs by the employer. We conclude that it was not unreasonable for the DOL to reject this line of argument.
 
 IV. CONCLUSION
 
 49
 We must remain mindful of the limited nature of our judicial function to judge agency action by the yardstick of reason--not beneficence. Many farmworkers living below the poverty line cannot avail themselves of distant work opportunities for lack of means to cover the cost of transportation--even for the short period of time until receipt of reimbursement of such costs by the employer. See Declaration of Nelson Carrasquillo, Executive Director of CATA, reprinted in J.A. at 579. Appellants cite DOL statistics showing that during the apple harvest season one-third of all U.S. farmworkers are unemployed and looking for work. Appellants' Brief at 22 (citing U.S. Farmworkers in the Post-IRCA Period: Based On Data From the National Agricultural Workers Survey (NAWS), Research Report No. 4, U.S. Dep't of Labor 31-32 (Mar. 1993)). On the other hand, apple growers cite significant losses incurred from their former practice of advancing travel costs to distant workers, because many workers never completed the required work. Brief for Appellees S & A Chaissan & Sons, Inc. at 3-4.
 
 
 50
 Under the H-2A regulations an employer may not offer benefits to foreign workers without also extending such benefits to domestic workers. CATA sought to compel apple growers to advance travel costs to Puerto Rican farmworkers on the grounds that the growers were advancing these costs to foreign workers. The DOL, reasonably we believe, interpreted the meaning of an advance, holding that in order to attribute an advance to the employers, the employers would ultimately have to bear the risk of loss in the event the advance is not repaid. It further determined--again reasonably we believe--that the employers do not bear the risk of loss in this case. The DOL has required the apple growers to offer low cost travel arrangements for domestic farmworkers and to cooperate with any domestic entity willing to enter into a loan arrangement similar to that involving the Jamaican Bank here. The DOL's disposition was reasonable which brings our role to an end.
 
 
 51
 Affirmed.
 
 
 
 [1]
 The appellees in this case are Robert B. Reich, Secretary of Labor, Thomas Hill, Regional Administrator of the Employment and Training Administration of the U.S. Department of Labor, the Department of Labor, Janet Reno, United States Attorney General, and the Immigration and Naturalization Service. Intervenor-appellees are a group of New York apple growers