**LA CASA DEL CONVALECIENTE, et al., Plaintiffs, Appellants,**

v.

**Louis SULLIVAN, Secretary of U.S. Department of Health and Human Services, Defendant, Appellee.**

No. 91–1827.

United States Court of Appeals, First Circuit.

Argued Feb. 5, 1992.

Decided May 22, 1992.

Eduardo Morales Coll, for plaintiffs-appellants.

Robert Wanerman, Asst. Regional Counsel, with whom Annette H. Blum, Chief Counsel, U.S. Dept. of Health and Human Services, Fidel A. Sevillano, Asst. U.S. Atty., and Daniel F. Lopez–Romo, U.S. Atty., were on brief, for defendant-appellee Health and Human Services.

Before SELYA, Circuit Judge,
ALDRICH and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

This appeal stems from the implementation by appellee, the Secretary of Health and Human Services ("Secretary"), of a new reimbursement system to suppliers of durable medical equipment ("DME") pursuant to the Omnibus Budget Reconciliation Act of 1987, 101 Stat. 1330 (1987) (codified as amended at 42 U.S.C. § 1395m) ("OBRA 87"). Appellants[1] are suppliers of DME located in Puerto Rico. Because the material facts were not in dispute, the case was submitted on cross motions for summary judgment. The district court held, *inter alia*, that: (1) the regulations issued by the Secretary and his agents for determining the amount of payments for DME were interpretive rules, and therefore, not subject to the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b) & (c); and (2) the Secretary's interpretation of the effective date of the new reimbursement scheme under OBRA 87 should be upheld. Appellants have appealed these district court rulings. We affirm.

## BACKGROUND

Congress created the Medicare program in 1965 to establish a federally funded system of health insurance benefits for the aged and disabled. The Secretary administers the Program through the Health Care Financing Administration ("HCFA"). The Medicare program is divided into two major components. Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c–1395i–2 (1992). Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of the reasonable charges for physician and laboratory services and certain medical supplies and equipment, including DME. 42 U.S.C. §§ 1395k, 1395*l*, 1395x(s), 1395rr(b)(1). Private insurance carriers under contract to the Secretary administer the Part B program. Under their contracts, the carriers assume responsibility for the processing and payment of claims for reimbursement. 42 U.S.C. § 1395u. In this capacity, the carriers act as the Secretary's agents. 42 C.F.R. § 421.5(b) (1991).

Prior to January 1, 1989, payments for DME purchases or leases were calculated based upon lump-sum purchases, lease purchases, or rental arrangements. The carrier was delegated the task of determining which of the three reimbursement methods would be more economical and practical. In an effort to simplify the payment process, Congress enacted § 4062(b) of OBRA 87 and created a new system of fee schedules to be applied by carriers for the reimbursement owed to participating DME suppliers. 42 U.S.C. § 1395m(a). The new system applies to items furnished on or after January 1, 1989. OBRA 87 at § 4062(e).

Under the new system, the payment basis is "the lesser of—(i) the actual charge

---

1. Appellants are: La Casa del Convaleciente, Inc., Professional Rental Corp., City Health Rental and Sales Equipment Corp., Emergency Medical Home Service, Inc., City Oxygen Service, Inc., Easy Medical Equipment Corp., and Valley Medical Distributor, Inc. Medics, Inc., one of the original plaintiffs in the action, has not joined in the appeal.

for the item, or (ii) the payment amount recognized under paragraphs (2) through (7) of this subsection for the item; ...." 42 U.S.C. § 1395m(a)(1)(B). Subsection (C) states: "This subsection shall constitute the exclusive provision of this subchapter for payment for covered items under this part or under part A of this subchapter to a home health agency." The payment amount under (B)(ii) is defined for our purposes as follows: "equal to the average of the purchase prices on the claims submitted on an assignment-related basis for the unused item supplied during the 6–month period ending with December 1986." 42 U.S.C. § 1395m(a)(8)(A)(i)(II).

Following the enactment of OBRA 87, the Secretary and HCFA published two documents intended to assist the implementation of the congressional amendments to Part B. These are the documents at issue. The first document, Transmittal Letter No. 1279 ("HCFA Transmittal Letter"), was issued by HCFA to carriers nationwide regarding the implementation of the new reimbursement system. The Transmittal Letter contained instructions to the carriers for determining the payment amount when there was no data available for calculating the "average" purchase price. The carriers were told to apply gap-filling procedures. The Transmittal Letter itself refers to gap-filling procedures but does not set them forth.

The second document, Circular Letter No. M–88–12–071 ("Circular Letter"), was issued by Seguros de Servicio de Salud ("SSS"), the Medicare Part B carrier that services Puerto Rico, and was directed solely to the Puerto Rico suppliers of DME. The Circular Letter contained detailed instructions to DME suppliers concerning the new billing and payment procedures.

## I. NATURE OF THE RULES

The material facts are not in dispute. We, therefore, determine whether the district court erred as a matter of law. The standard of summary judgment review is *de novo. Massachusetts Dep't of Public Welfare v. Yeutter*, 947 F.2d 537, 541 (1st Cir.1991); *New England Legal Found. v. Massachusetts Port Auth.*, 883 F.2d 157, 167 (1st Cir.1989).

Appellants contend that the Transmittal and Circular Letters requiring the use of gap-filling procedures constitute substantive rules requiring notice and comment under the APA to be valid and effective. They specifically argue that the gap-filling procedure in the HCFA Transmittal contravenes the express language of OBRA 87 by using a method for determining the average purchase price unrelated to the designated six-month period, in violation of 42 U.S.C. § 1395m(a)(8)(A)(i)(II).

We start, therefore, by attempting to determine the distinction between a substantive rule and an interpretive one. As the District of Columbia Circuit has noted, the distinction between the two types of rules is "enshrouded in considerable smog." *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984) (quoting two earlier decisions), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). We have, however, gleaned from the relevant caselaw some glimmers of guidance.

The APA requires publication of proposed agency rules that are substantive followed by a period for public consideration and comment. 5 U.S.C. § 553(b), (c).[2]

**2.** The provisions provide in relevant part,
(b) General notice of proposed rule making shall be published in the Federal Register.... Except when notice or hearing is required by statute, this subsection does not apply—
  (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
  (B) when the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

Interpretive rules are not subject to notice and comment requirements. If a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive. *Ohio Dep't of Human Servs. v. HHS*, 862 F.2d 1228, 1233 (6th Cir.1988). A substantive rule "has the force of law," while an interpretive rule is "merely a clarification or explanation of an existing statute or rule" and is " 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.' " *Guardian Fed. Sav. & Loan Ass'n v. FSLIC*, 589 F.2d 658, 664–65 (D.C.Cir.1978) (quoting United States Department of Justice, *Attorney General's Manual on the Administrative Procedures Act*, at 30 n. 3 (1947)). An interpretive rule creates no law and has no effect beyond the statute. *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 (D.C.Cir.1979).

In *Levesque v. Block*, 723 F.2d 175, 182 (1st Cir.1983), we found that the agency's own characterization of the rule was important, although not conclusive, in determining the true nature of a rule. "Where ... an agency has authority to issue both legislative and interpretative rules, '[t]he crucial question is whether the agency intends to exercise delegated [lawmaking] power ..., and the intent usually can best be found in what the agency says at the time of issuing the rules.' " *Id.* at 182 (quoting K. Davis, *Administrative Law of the Seventies* § 5.03, at 148 (1976)). *See also American Postal Workers Union v. Postal Servs.*, 707 F.2d 548, 559 (D.C.Cir. 1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

In *Levesque*, we looked to the substantial impact of the rule as a relevant factor in construing the intent of the agency in issuing the rule. 723 F.2d at 182. Other circuits, however, have moved away from considering the level of impact on interested parties as a factor in correctly classifying a rule or regulation. *See, e.g., American Postal Workers Union v. Postal Servs.*, 707 F.2d at 560 (finding that "the impact of a rule has no bearing on whether it is legislative or interpretative; interpretative rules may have a substantial impact on the rights of individuals.") (citing 2 K. Davis, *Administrative Law Treatise* § 7:8, at 39 (2d ed. 1979)); *Friedrich v. HHS*, 894 F.2d 829, 836 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990) ("Any determination by the Secretary regarding rules of Medicare reimbursement eligibility, regardless of how it is promulgated, will have a substantial impact on a large number of people.").

We have recognized that where a complex scheme of Medicare reimbursement is at issue, the Secretary is entitled to a heightened degree of deference.

> Deference is particularly appropriate in an area that is as complex as the field of Medicare reimbursement. In such an area "[m]atters of accounting, unless they 'be the expression of a whim rather than an exercise of judgment,' are for the agency." *Hospital San Jorge v. Secretary of Health, Education & Welfare*, 616 F.2d 580, 589 (1st Cir.1980) (Campbell, J. concurring) (quoting *American Telephone & Telegraph Co. v. United States*, 299 U.S. 232, 237, 57 S.Ct. 170, 172, 81 L.Ed. 142 (1936)).

*Cheshire Hosp. v. New Hampshire–Vermont Hosp. Service*, 689 F.2d 1112, 1117 (1st Cir.1982). The following language of the Third Circuit is pertinent to the situation before us:

> Such deference is especially appropriate here, where the Secretary's resolution involves a complex scheme of reimbursement for a sizable number of medical procedures. Legislators and judges are not medical specialists, and for that reason it is necessary that administrative agencies develop and apply medical expertise. Accordingly, Congress described only sparsely the means of assessing reasonable costs owed to Medicare providers, and instead assigned the primary responsibility for such assessments to the Secretary.... We must be cautious lest we disturb this appropriate allocation of governmental functions.

*Butler County Memorial Hosp. v. Heckler*, 780 F.2d 352, 356 (3d Cir.1985) (citations omitted).

The statute requires the payment price for DME to be set at the "lesser" of the actual purchase price or the average of the purchase prices during the six-month period ending in December 1986. The statute further provides that this system is the exclusive manner in which payment shall be determined. 42 U.S.C. § 1395m(a)(1)(C).

The problem giving rise to this litigation is that there is no relevant data in Puerto Rico to calculate an average of purchase prices for DME during the requisite period. The literal language of the statutory calculation, therefore, could not be applied in Puerto Rico. The Transmittal Letter provides for circumstances when there is no data by gap-filling in the fee schedule. Section 5102.2(A)(2)(a) of the Letter provides for an amount "1.017 times [3] the gap-filled prevailing charge amounts in effect December 31, 1986."

The district court characterized the gap-filling method as "the Secretary's best attempt to help carriers arrive at the payment amounts as set out in the statute" and "as a form of interpretation of the statute, an interpolation necessary to fill in where numbers are missing." *Medics, Inc. v. Sullivan*, 766 F.Supp. 47, 57 (D.P.R. 1991).

We must confess that we do not understand exactly how the gap-filling procedure plays out, and the parties have not enlightened us.[4] We assume, however, that this is a matter within the expertise of the carriers, and that, by using a gap-filler, the Secretary will arrive at a payment basis that is less than the actual charges for the items. The Secretary argues that the difference between the actual and average charge is *de minimis* but has not substantiated this. It is clear, however, that the Transmittal Letter is a limited remedy for a limited period of time because once the data necessary for determining the average

of the purchase prices on DME becomes available, the need for gap-filling vanishes. This restricted application suggests that publication and comment would be overkill.

Following our own circuit precedent, we find that the agency did not intend to exercise its delegated law-making power when it issued the gap-filling procedures. It was merely attempting to meet the mandate of the statute in a situation where the data necessary to determine the average price was not available. *See Levesque v. Block*, 723 F.2d at 182.

In *Levesque* we also looked to the substantial impact of the rule in determining agency intent. Here, appellants have not submitted any facts or figures showing a substantial impact. The Secretary has argued that the impact would be *de minimis* but does not buttress his argument with pertinent calculations. The question of the severity of the impact is, therefore, left hanging. Since appellants wish us to consider impact as a sign that the rule is substantive rather than interpretive, however, the absence of any evidence on this point does not forestall the entry of summary judgment. *See, e.g., Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (where opponents of summary judgment bear the burden of proof on an issue, they must "reliably demonstrate that specific facts sufficient to create an authentic dispute exist").

Based on the applicable legal principles and the specific situation with which we are dealing, we hold that the gap-filling procedure required by the Transmittal Letter is an interpretive, not substantive, rule. Therefore, the notice and comment provisions of the APA do not apply.

## II. EFFECTIVE DATE

■ The question of how the effective date of OBRA 87 is to be applied is one of statutory interpretation. We must first ask whether Congress has "directly addressed the precise question at issue."

---

3. This figure is based upon the increase in the urban consumer price index from July 1987 through December 1987. Brief for Appellees at 33.

4. We have added as an appendix portions of an exhibit pertaining to the gap-filling procedure.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If the intent of Congress is ambiguous, then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. *Massachusetts Dep't of Public Welfare v. Yeutter,* 947 F.2d at 541.

The statute in question reads as follows: EFFECTIVE DATE.—The amendments made by this section shall apply to covered items furnished on or after January 1, 1989.

OBRA 87 at § 4062(e). The Transmittal Letter provides that the OBRA amendments shall apply to "services rendered on or after January 1, 1989."

Appellants contend that the effective date in the Transmittal Letter contravenes the explicit language of the statute which, they claim, applies only to equipment provided to a beneficiary for the first time on or after the relevant date. All DME furnished before January 1, 1989, then, would not be subject to the new fee schedule of OBRA 87, but instead, would continue to operate for a maximum of fifteen months [5] under the old payment scheme.

We agree with the district court's finding that the statutory language is ambiguous:
> "Furnished" may mean the original delivery and installment of the DME. On the other hand, one could say that the supplier "furnished" an oxygen machine in February 1989, even if that machine had been in continuous use by that same beneficiary for the two years prior to February 1989.

*Medics, Inc. v. Sullivan,* 766 F.Supp. at 56. We must, therefore, look to the legislative history to determine congressional intent. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82; *Wilcox v. Ives,* 864 F.2d 915, 925 (1st Cir.1988).

The legislative history reveals that Congress passed the OBRA amendments to create an entirely new, simplified, and uniform system of reimbursement for DME.

Under current law, durable medical equipment [DME] ... are reimbursed on the basis of reasonable charges, using a methodology generally comparable to that used to pay for physician services.... However, there is great dissatisfaction on the part of virtually all the interested parties—patients, suppliers, and carriers—with the current rules. For durable medical equipment in particular, the current rules requiring that the carrier make a determination whether the equipment should be purchased or rented have lead to confusion and frustration. Medical outlays for such services are now appropriately $2 billion per year, so the problem is of sufficient magnitude that an overall reform is warranted.

The Health Care Financing Administration has expressed concerns that payments might be excessive for some of these items and has tried various means of constraining outlays. Suppliers have complained about the frequency of change in the payment rules, the lack of consistency and predictability in the application of policies, and long delays in payment. Carriers have expressed concerns about the complexity of the rules and the difficulty of making rent/purchase determinations. Patients have complained about the confusing rules and delays in payment, which sometimes impair their access to these items.

The Committee bill would attempt to resolve these problems by completely restructuring the payment methodology for these items and services.

The Secretary's inclusion of DME furnished prior to January 1, 1989 is not inconsistent with congressional intent behind OBRA 87. Indeed, to give effect to appellants' argument would mean a reimbursement program that had one payment schedule under the new system and another payment schedule under the old system. This would be confusing and contrary to the express congressional objective of simplify-

---

**5.** The fifteen-month period is pursuant to the maximum duration of a certificate of need for

reimbursement payments. Reply Brief of Appellants at 5.

ing the payment schedule to DME suppliers. Appellants also contend that the effective date in the Transmittal Letter makes the regulation retroactive. We conclude otherwise. We, therefore, hold that the Secretary acted within his discretion in enacting the effective date in the Transmittal Letter.

*Affirmed.*

Costs awarded to appellee.

*Use of Relative Value Scales and Conversion Factors*

The relative value scales used to fill gaps in charge data for the Medicare program should, to the extent possible, be those that you [carriers] use in your own programs. Relative value scales developed by you or by medical societies for states other than those in which your Medicare service area is located should be carefully reviewed and validated before they are used. Ensure that a relative value scale, which is used to estimate customary charges or prevailing charges, accurately reflects charge patterns in the area you service. Similarly, the conversion factor used with the relative value scale should reflect the known customary charges of the physician or other person for whom a customary charge is being estimated, or the known prevailing charges for services in the locality, as appropriate.

**.97 Use of other methods to fill gaps in reasonable charge screens.**—Where there is insufficient actual charge data for determining the customary charge of a physician or supplier and/or the prevailing charge in the locality for a particular medical procedure or service, the carrier should use one of the following gap-filling methods to establish the needed screen.

*Gaps in Customary Charge Screens*

Fill a gap in a customary charge screen (1) by applying a conversion factor derived from the physician's (or supplier's) known customary charges for other services in the same category of service (medicine, surgery, etc.) to a relative value scale in the manner suggested in § 5022 1 below, or (2) by using the 50th percentile in the array of customary charges (weighted by frequency) that you have used to establish the prevailing charges for similar services for the physicians in the same specialty and locality.

Ensure that, where a 50th percentile charge is used as a customary charge for payment purposes, the reasonable charge does not exceed either that amount or the locality prevailing charge. Also, all carriers that use 50th percentile charges to fill gaps in their customary charge data must retain the capacity to calculate and use conversion factors with relative value scales when this is appropriate.

*Gaps in Prevailing Charge Screens*

Where you have not been able to establish a prevailing charge for a service on the basis of the steps outlined in § 5020 [¶ 3225], use a prevailing charge conversion factor [see below] and a relative value scale, manually if necessary, to determine a prevailing charge. (See § 5205 [¶ 3190.76] regarding charges for rare or unusual procedures. This is to be used as a last resort before basing the prevailing charge on your best judgment.)

*Medicare Carriers Manual § 5022.*

¶ **3225**

As a result of consent agreements with the Federal Trade Commission (FTC) relative value scales formerly published by the American Academy of Orthopedic Surgeons, the American College of Obstetricians and Gynecologists, the American College of Radiology, and the California Medical Association have been withdrawn from circulation. The FTC consent agreements did not bar the use of the related procedural terminology and coding systems. However, do not use these four relative value scales to fill gaps in customary and prevailing charge data.

This does not mean that you must discontinue using relative value scales to fill gaps in customary charges or in determining prevailing charges Instead use a system of relative value units that has not been the subject of a consent agreement, or develop your own system. A potential source of information in this regard is the relative value scale that has been included with the HCFA Common Procedure Code System (HCPCS). This RVS is included with HCPCS as an informational item only You may use it, revise it, or use some other RVS if you deem it more appropriate

You may, if necessary develop a RVS for gap filling purposes by dividing the *unadjusted* prevailing charges in a locality by a common denominator and filling the gaps in the resulting "RVS" by relying on medical staff judgment or on other persons with knowledge of the charging patterns and practices in your service area. Alternatively, you may use a service area wide approach and/or the unweighted average of the customary charges that have been made for a service, divided by a common denominator.

Customary and/or prevailing charge conversion factors used with relative value scales to fill gaps in carrier reasonable charge screens should be calculated as outlined in A and B below.

©1989, Commerce Clearing House, Inc.

(Separate customary charge conversion factors should be developed for each physician or supplier from his known customary charges in the same category of service, e.g., medicine, surgery, radiology, etc. Similarly, separate prevailing charge conversion factors, by locality and specialty or groups of specialties, should be calculated based on the known prevailing charges, by locality and specialty, or groups of specialties within the same category of service. Customary charge conversion factors may only be calculated for a physician for a category of service if the physician has *at least seven* customary charges for services in that category of service upon which to base the conversion factor calculation. If a physician does not have sufficient customary charges to calculate a conversion factor in one category of service, this does not preclude the calculation of his customary charge conversion factors for other categories of service for which he does have sufficient customary charges.)

A. *Customary Charge.*—The following formula should be used for the calculation of a customary charge conversion factor:

C/F = Customary charge conversion factor

CHG = The physician's customary charge for a procedure

SVC = Number of times the physician performed the procedure

1-n = The different procedures the physician performed within a category of service

RVU = The relative value unit assigned to a procedure

$$\Sigma = \text{Sum of}$$

$$C/F = \frac{\dfrac{CHG_1}{RVU_1} \times SVC_1 + \dfrac{CHG_2}{RVU_2} \times SVC_2 \ldots \dfrac{CHG_n}{RVU_n} \times SVC_n}{\Sigma SVC_{1-n}}$$

*Example:* Compute a customary charge conversion factor for a physician with the following charge history: (May be for medicine, surgery, radiology, pathology)

| Procedure | Frequency | Customary Charge | Relative Value |
|---|---|---|---|
| 1 | 3 | $ 5.00 | 1 |
| 2 | 7 | 12.00 | 2 |
| 3 | 5 | 35.00 | 4 |
| 4 | 4 | 20.00 | 3 |
| 5 | 6 | 8.00 | 1.5 |
| | 25 | | |

*Method.*

(1) For each procedure, divide the customary charge by the relative value and multiply the result by the frequency of that procedure in the physician's charge history.

(2) Add all the results of these computations.

(3) Divide the result by the sum of all the frequencies.

*Solution:*

$$\frac{\dfrac{(5 \times 3) +}{1} \dfrac{(12 \times 7) +}{2} \dfrac{(35 \times 5) +}{4} \dfrac{(20 \times 4) +}{3} \dfrac{(8 \times 6)}{1.5}}{25}$$

$$\frac{(5 \times 3) + (6 \times 7) + (8.75 \times 5) + (6.67 \times 4) + (5.33 \times 6)}{25}$$

$$\frac{15 + 42 + 43.75 + 26.68 + 31.98}{25}$$

$$\frac{159.41}{25} = \$6.40 \text{ (i.e., } \$6.38 \text{ rounded to nearest 10 cents)}$$

To determine a physician's customary charge for a particular procedure where there is no reliable statistical basis, multiply the relative value of the procedure by the physician's customary charge conversion factor for the appropriate category of service (e.g., radiology, medicine, surgery).

B. *Prevailing Charges.*—The prevailing charge conversion factors to be used with the appropriate relative value scale will be developed from the same formula used for customary charge conversion factors, *except that*

¶ 3225