Ann **WARDER, et al., Plaintiffs, Appellees,**

v.

**Donna E. SHALALA, Secretary of the Department of Health and Human Services, and Nancy Ann Min DeParle, Administrator of the Health Care Financing Administration, Defendants, Appellants.**

No. 97–2047.

United States Court of Appeals, First Circuit.

Heard Jan. 5, 1998.

Decided July 27, 1998.

---

Clifford M. Pierce, Assistant Regional Counsel, Department of Health and Human Services, with whom Frank W. Hunger, Assistant Attorney General, Department of Justice, Harriet S. Rabb, General Counsel, and Nancy S. Nemon, Chief Counsel, Region I, Department of Health and Human Services, were on brief for appellants.

James P. Kelly with whom Patrick M. Connolly, Kelly Law Firm, Craig E. Stewart, Anne Robbins and Palmer & Dodge LLP were on brief for appellees.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

CAMPBELL, Senior Circuit Judge.

This appeal relates to the classification, for Medicare Part B reimbursement purposes, of medical equipment made for persons suffering from severe musculoskeletal problems. Produced by Appellees OrthoConcepts and used by Appellee Warder, the equipment consists of braces, fitted to the individual patient, on a wheeled base. The district court upheld OrthoConcepts' challenge to an administrative ruling ("the Ruling" or "HCFAR 96–1") from the Health Care Financing Administration ("HCFA") that classifies this equipment as "durable medical equipment" rather than as "braces." The former classification limits Medicare reimbursement to devices used at home, precluding reimbursement for such devices when used in certain hospital and institutional settings.

Holding that HCFAR 96–1 was a substantive, or legislative, rule requiring notice and comment, the court ruled it to be invalid because notice and comment procedures had not been followed prior to its issuance. The court also found that the equipment in dispute was not "durable medical equipment," and enjoined HCFA from treating it as such.

We disagree. We hold that HCFAR 96–1 is an interpretive rule, and was not invalidated by HCFA's failure to have adopted notice and comment procedures. We vacate the injunction on the ground that HCFA's interpretation was a permissible one.

## BACKGROUND

1. *Statutory and Regulatory Background*

### A. *Part B of the Medicare Act*

The Medicare Act, 42 U.S.C. § 1395 *et seq.*, establishes a national health insurance program for the elderly and the disabled. Congress authorized Appellant Secretary of Health and Human Services to implement the Medicare statute by issuing both substantive regulations and interpretive rules. *See* 42 U.S.C. § 1395hh. The Secretary has in turn delegated this authority to the HCFA Administrator.

Part B of the Medicare Act, 42 U.S.C. § 1395j *et seq.*, establishes a voluntary supplemental insurance program. Eligible individuals enrolled in the program pay a monthly premium that, along with congressionally appropriated funds, finances physicians' and other health services. *See id.* § 1395j. Part B has been referred to as "a private medical insurance program that is subsidized in major part by the Federal Government." *Schweiker v. McClure*, 456 U.S. 188, 190, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982).

Part B benefits are administered by private insurance carriers under contract with HCFA. *See* 42 U.S.C. § 1395u. HCFA reimburses a carrier for the costs of administering claims, and the carriers act as HCFA's agents. *See id.* § 1395u(a); 42 C.F.R. § 421.5(b). The carrier bears the initial responsibility for determining whether an item or service billed to the Part B program is covered and, if so, the amount to be paid. *See* 42 U.S.C. § 1395u.

### B. *Part B Coverage of DME and Braces*

Medicare Part B provides coverage for "medical and other health services," 42 U.S.C. § 1395x(s), that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," *id.* § 1395y(a)(1)(A). The statute expressly covers braces, including "leg, arm, back, and neck braces." *Id.* § 1395x(s)(9).

Ordinarily, coverage will extend to any piece of equipment that is reasonable and

necessary for the treatment of an eligible patient regardless of the place where it is used. However, Part B reimburses devices classified as "durable medical equipment" ("DME") only when provided at the patient's "home" or other "institution used as [the patient's] home," and not in a hospital or skilled nursing facility ("SNF"). 42 U.S.C. § 1395x(n) (citing §§ 1395x(e)(1) (defining hospital), 1395i–3(a)(1) (defining SNF)).[1] In other words, DME is reimbursable only when used in a patient's home, with "home" being defined to exclude hospitals and SNFs.

No similar restriction relates to "braces." *See* 42 U.S.C. § 1395x(s)(9). Hence if a piece of medical equipment used in a hospital or SNF is a "brace," it is reimbursable—but not if deemed to be DME.

## C. *DME and Braces Defined*

The medical device here, intended for persons with severe musculoskeletal failure, includes a set of connected braces attached to a wheeled base. *See infra.* While various provisions define braces and DME, no single provision concisely differentiates the two, leaving it open which category is implicated when, as here, a brace-like device is used as part of a wheeled item that might be classified as DME.

The principal statutory definition of DME states that "[DME] includes iron lungs, oxygen tents, hospital beds, and *wheelchairs.*" 42 U.S.C. § 1395x(s)(6) (emphasis supplied). Elsewhere the statute includes special payment provisions for certain types of DME, including "items requiring frequent and substantial servicing," *id.* § 1395m(a)(3), and equipment customized to an individual patient's needs, *see id.* § 1395m(a)(4). However, neither of these provisions can be read to expand § 1395x(s)(6)'s definition of DME, because both are expressly limited to a subset

of DME. *See id.* § 1395m(13) (defining "covered item[s]" under § 1395m to be DME "as defined in section 1395x(n)").

In 1990, Congress amended § 1395m(a)(4) to add a provision—which ultimately, by its own terms, was superseded by a HCFA regulation—expressly providing that customized wheelchairs were DME. P.L. 101–508, § 4152(c)(4)(B).[2] The amendment provided that it would become effective on January 1, 1992, unless HCFA developed its own criteria for the treatment of customized wheelchairs as DME. In December, 1991, HCFA addressed customized wheelchairs in a regulation that substantially tracked the language of the amendment, providing that a wheelchair is DME if "uniquely constructed or substantially modified for a specific beneficiary" and "so different from another item used for the same purpose that the two items cannot be grouped together for pricing purposes." 42 C.F.R. § 414.224. In effect, Congress, and subsequently HCFA, treated as DME any wheelchair modified in light of an individual patient's disability, per a physician's instructions.

The regulatory definition of DME focuses not on examples, but rather on qualitative criteria, including the equipment's durability:

equipment, furnished by a supplier or a home health agency that—

(1) Can withstand repeated use;

(2) Is primarily and customarily used to serve a medical purpose;

(3) Generally is not useful to an individual in the absence of an illness or injury; and

(4) Is appropriate for use in the home [citing 42 C.F.R. § 410.38, which in turn

1. *See also* 42 C.F.R. § 410.38(a), (b) (explaining that "Medicare Part B pays for [DME], if the equipment is used in the patient's home or in an institution that is used as a home" and that "[a]n institution that is used as a home may not be a hospital or a [critical access hospital as defined at 42 U.S.C. § 1395x(mm)] or a SNF").

2. The amended definition of DME included any wheelchair "measured, fitted, or adapted in con-

sideration of the patient's body size, disability, period of need, or intended use, and … assembled by a supplier … who makes available customized features, modifications, or components for wheelchairs that are intended for an individual patient's use in accordance with instructions from the patient's physician." P.L. 101–508, § 4152(c)(4)(B).

cites statutory provisions defining "home" to exclude hospitals and SNFs].

42 C.F.R. § 414.202.

The manual HCFA prepares for its carriers repeats the regulatory criteria. *See Medicare Carrier's Manual* (*"MCM"*) § 2000.1. Another provision in the manual goes farther, explaining that DME includes "supplies and accessories" that are "necessary for the effective use of [DME]." *MCM*, § 2100.5.

The statutory definition of "brace" is ostensive, listing the sorts of braces that are covered. *Id.* § 1395x(s)(9) (defining orthotics as "leg, arm, back, and neck braces, and artificial legs, arms, and eyes, including requirements if required because of a change in the patient's physical condition"). The accompanying regulation, 42 C.F.R. § 414.202, tracks the statutory language.

### 2. *The OrthoConcepts Product*

Due to illness, injury, and in some cases old age, thousands of Medicare beneficiaries suffer from musculoskeletal failure so severe as to render them incapable of moving or supporting their own limbs. These catastrophically crippled patients are vulnerable to numerous painful conditions. One of the most serious is contractures, a condition in which muscles become rigid and resistant to elongation following a long period of disuse. *See Dorland's Illustrated Medical Dictionary* 373 (28th ed.1994). Other complications include the development of pressure sores, circulatory problems, and infections.

To manage the condition of patients with grave musculoskeletal failure, OrthoConcepts designed what it has marketed as the "OrthoConcepts Seating System." The Seating System consists of a set of connected braces—the number and type depending on the patient's condition—attached to a wheeled base. The patient sits, or reclines, on the Seating System, and the component braces maintain the patient in a position designed to reduce the weight borne by weaker extremities and to prevent contractures. Since 1989, OrthoConcepts has supplied the Seating System to more than 2700 patients.

### 3. *HCFA's Classification of the OrthoConcepts Seating System*

On December 7, 1989, OrthoConcepts informed a regional HCFA office that OrthoConcepts would soon begin marketing the Seating System nationwide. OrthoConcepts' letter inquired about the Medicare coverage status of the Seating System and asked HCFA to establish a new billing code (known as a "L code," a standardized billing classification for "orthotics," or braces) that would allow the Seating System to be reimbursed as a brace. The regional office replied in January of 1990, advising OrthoConcepts that Part B covered the Seating System as DME, not as orthotics, and that it would provide no L Code for billing the Seating System as an orthotic.

The regional office also wrote its private carriers regarding the Seating System, instructing them to treat the device as DME. By letter dated February 21, 1990, the carrier then responsible for OrthoConcepts' claims, Nationwide Insurance, notified OrthoConcepts of the HCFA regional office's letter and informed it that its products "are classified as [DME]; not orthotics."

In late 1992, HCFA reorganized its system for processing claims for DME and orthotics, replacing local carriers with four regional carriers known as "DMERCs." HCFA instructed the DMERCs to issue uniform reimbursement policies. In August, 1993, the DMERCs announced that they would reimburse certain orthotic seating systems (known by the billing designations or "K-codes" as K–0115 and K–0116) as braces. These seating systems were functionally quite similar to the OrthoConcepts Seating System, differing principally in that they were fitted using a plaster cast of the individual patient rather than the manually-adjusted attachments that are part of the Seating System. The following April, after learning of this billing practice, HCFA informed the DMERCs that K-codes 0115 and 0116 described DME, not orthotics. The DMERCs in turn notified their respective suppliers of HCFA's determination.

Despite HCFA's 1990 letter declaring the Seating System DME, OrthoConcepts,

through its corporate affiliates, continued to bill Seating Systems supplied to patients at SNFs as an orthotic. Upon learning of this practice, HCFA's Region A DMERC suspended Medicare payments to OrthoConcepts in December, 1994. Following a meeting with OrthoConcepts representatives and an inspection of SNFs where the Seating System was in use, one of the carriers concluded that the billed equipment was in fact DME, and notified the OrthoConcepts affiliates that it was obligated to refund the Part B payments. Soon thereafter, the Region B and Region C DMERCs denied OrthoConcepts reimbursement.

OrthoConcepts appealed from the carriers' denials of their Part B claims.[3] In the Region A appeal, a Part B hearing officer issued a decision on August 30, 1995, finding that the Seating System was DME and concluding that Part B did not provide reimbursement for the disputed claims. However, after an *ex parte* hearing, an ALJ reversed the hearing officer's decision on January 3, 1996, ruling that the Seating Systems "[were] orthotic braces and not wheelchairs." On March 1, 1996, the Appeals Board denied HCFA's petition to review the ALJ's decision.

The Region B and Region C appeals were consolidated before a carrier fair hearing officer. On February 9, 1996, the hearing officer decided that the Seating System was an orthotic device rather than DME. This ended the matter, as the statute gives HCFA no administrative appeal from a hearing officer's adverse decision.

The net result of these proceedings was that by early 1996, HCFA's view of the Seating System as DME—as expressed in its 1990 letter to OrthoConcepts and its 1994

notice to its carriers—was at odds with the decisions of an ALJ and a hearing officer.

These decisions prompted HCFA to issue HCFAR 96–1, which became effective September 18, 1996. Noting the above-mentioned decisions classifying the Seating System as an orthotic, the Ruling's stated purpose is "to provide clarification and guidance regarding the scope and meaning of the statutory benefits for 'orthotics' and '[DME].'" HCFAR 96–1 at 2. The Ruling discusses the relevant statutes, regulations, legislative history, and administrative materials before reaching its conclusion: the definition of "orthotics" "is limited to leg, arm, back, and neck braces that are used independently [of], rather than in conjunction with, or as components of, other kinds of medical equipment." *Id.* at 10. The Ruling also provides several illustrations of DME, one of which unmistakably refers to the OrthoConcepts Seating System. *See id.* at 7–8.

On February 26, 1997, two Medicare beneficiaries who used the Seating System in SNFs and three OrthoConcepts suppliers (hereinafter, Appellees will be referred to collectively as "OrthoConcepts") brought the present district court action challenging HCFAR 96–1. Appellees advanced the procedural claim that HCFAR 96–1 was invalid, having been adopted without compliance with the notice-and-comment procedures of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, and the Medicare statute, 42 U.S.C. § 1395hh. Appellees also made the substantive claim that HCFAR 96–1 was arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A). Appellees sought a declaration that the Ruling was void and that the Seating System was reimbursable as a brace. They

---

**3.** To receive reimbursement of past medical expenditures or pre-payment of expected costs, the beneficiary of the expenditures (or a "supplier of services" that has accepted assignment of the beneficiary's claim) must request payment from HCFA' designated carrier. *See* 42 U.S.C. § 1395u(a) (granting authority to utilize private insurance carriers for administration of Part B claims). Each carrier contract must require the carrier to provide a "fair hearing" for suppliers whose claims are denied and that meet an amount-in-controversy requirement. *See id.* § 1395u(b)(3)(C).

If dissatisfied with the result of the fair hearing, the beneficiary or supplier may appeal to an Administrative Law Judge and, if necessary, to the Departmental Appeals Board. *See id.* § 1395ff(b)(2)(B). Judicial review of an adverse Appeals Board decision may be obtained if the amount in controversy is one thousand dollars or more and the beneficiary or supplier files a district court action within sixty days. *See id.* § 1395ff(b)(1), (b)(2)(B).

also requested a preliminary injunction blocking HCFA from enforcing the Ruling.

After holding a hearing on Appellees' motion for a preliminary injunction, the district court notified the parties that it would issue a final determination on the merits of Appellees' claims. On March 7, 1997, the district court ruled that HCFAR 96–1 is a substantive rule and, therefore, invalid because HCFA issued it without following notice and comment procedures. The court went on to hold that, the definitions of DME and orthotics in effect prior to the Ruling prevented HCFA from treating the Seating System as DME. (The court left open the possibility that HCFA could validly re-enact the Ruling after using notice and comment procedures.) The court also enjoined HCFA from denying Appellees reimbursement for the Seating System.

This appeal followed.

## DISCUSSION

1. *The Interpretative Rule Exception to the Requirement of Notice and Comment*

■ Whether an administrative ruling is substantive or interpretative is a question of law that this court reviews *de novo. See La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1177 (1st Cir.1992) (*"Convaleciente"*).

The APA exempts "interpretative rules" from its notice and comment procedures. 5 U.S.C. § 553(b)(B). The Medicare Act expressly incorporates the APA's exemption for interpretive rules. *See* 42 U.S.C. § 1395hh(b)(2)(C) (1994).[4]

■ The line between a legislative or substantive rule and an interpretive one is, as many courts have noted, far from clear. *See, e.g., Convaleciente*, 965 F.2d at 1177. The APA itself does not define "substantive" and "interpretive" (or, in the APA's nomenclature, "interpretative") rules. Moreover, courts and other authorities have provided any number of definitions, lending further imprecision to the field. Nevertheless, a few reasonably clear principles have emerged, leading us to conclude that HCFAR 96–1 is interpretative, and could be promulgated without notice and comment procedures.

The most authoritative explanation of the substantive/interpretative distinction is that provided by the *Attorney General's Manual on the Administrative Procedure Act* (1947).[5] The *Attorney General's Manual* described an interpretive rule as one "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Id.* at 30 n. 3. Courts have routinely quoted this definition with approval. *See Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *Convaleciente*, 965 F.2d at 1178. The *Attorney General's Manual* defines substantive, or legislative, rules as those that

are issued by an agency pursuant to statutory authority and which implement the statute [such as the Securities and Exchange Commission's proxy rules issued pursuant to the Securities Exchange Act of

---

4. The Social Security Act ("SSA"), of which the Medicare statute is part, phrases the distinction between substantive and interpretative rules slightly differently from the APA, requiring notice and comment procedures for any rule "that establishes or changes a substantive legal standard governing the scope of benefits," 42 U.S.C. § 1395hh(a)(2), but exempting by implication, *inter alia*, "interpretive rules," *id.* § 1395hh(c) (requiring periodic publication of "interpretive rules" that have not been issued as regulations).

We proceed herein as if the SSA's exemption for interpretative rules were identical to the APA's. The SSA's language, drafted after the APA's, can fairly be read to duplicate the APA on this score. *See Medics, Inc. v. Sullivan*, 766

F.Supp. 47, 51 (D.P.R.1991) ("[Section 1395hh] does not impose on the Secretary any duty which he did not already have under the [APA], in the sense that both require full rule-making only for substantive rules or policy changes."), *aff'd sub nom. Convaleciente*, 965 F.2d 1175 (1st Cir. 1992). OrthoConcepts has not argued that the two standards are materially different.

5. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 546, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (describing the *Attorney General's Manual* as "a contemporaneous interpretation [of the APA] previously given some deference by this Court because of the role played by the Department of Justice in drafting the legislation").

1934, 15 U.S.C. § 78n(b)]. Such rules have the force and effect of law.

*Id.*

These definitions have caused us to observe "that the distinction between legislative and interpretative rules has to do in part with the authority"—law-making versus law-interpreting—"under which the rule is promulgated." *Levesque v. Block,* 723 F.2d 175, 182 (1st Cir.1983). The Seventh Circuit has stated that "rules are legislative when the agency is exercising delegated power to make law through rules, and rules are interpretative when the agency is not exercising such delegated power in issuing them." *Metropolitan Sch. Dist. v. Davila,* 969 F.2d 485, 490 (7th Cir.1992).

■ Where a rule falls along the interpretative/legislative spectrum will turn in many cases on the novelty of a rule's substantive content. "If a rule creates rights, assigns duties, or imposes obligations, *the basic tenor of which is not already outlined in the law itself,* then it is substantive." *Convaleciente,* 965 F.2d at 1178 (emphasis supplied); *see also American Mining Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1112 (D.C.Cir.1993) (stating that a rule is legislative if "in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties"). Put more succinctly, a rule is exempt from notice and comment as

an interpretative rule if it does not "effect a substantive change in the regulations." *Guernsey,* 514 U.S. at 100, 115 S.Ct. 1232 (internal quotation marks and citation omitted).

On its face, HCFAR 96–1 appears to satisfy the criteria for an interpretive rule. We have said that an important factor in determining whether a rule is interpretive is the agency's own characterization. *See Convaleciente,* 965 F.2d at 1178; *Levesque,* 723 F.2d at 182. It is not disputed that HCFA intended HCFAR 96–1 to be interpretative. The Ruling itself purports only to "clarify" the proper application of existing statutory and regulatory definitions to a particular case.[6]

More importantly, the Ruling does not establish any new standard. Rather, it addresses an area of ambiguity: whether a device comprising both orthotic and DME components should be reimbursed as a brace or as DME. The statutory and regulatory definitions of DME and orthotics predated the Ruling, but neither was so complete as to provide an unambiguous answer to the question of the Seating System's classification.[7] These definitions created the need for clarification—precisely the function of an interpretative rule—and they provided an "adequate legislative basis for [the agency action]." *American Mining Congress,* 995 F.2d at 1112. The Ruling does not stake out any ground "the basic tenor of· which [was] not

---

6. In *Levesque* we stated that the impact of a rule on the regulated parties "may be relevant in construing the intent of the agency is issuing the rule." 723 F.2d at 182. Both sides have acknowledged that the Seating System's reimbursement classification has public importance. However, where, as here, the agency's intent is unambiguous, a rule's impact on the public ceases to be of possible significance in construing agency intent.

Indeed, this Circuit's law regarding the relevance of a rule's public impact is in doubt. We did not give the substantial impact factor any weight in *Convaleciente, see* 965 F.2d at 1178 (noting that other circuits have treated public impact as irrelevant), and the Supreme Court wholly ignored it in *Guernsey* and in *Reno v. Koray,* 515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (characterizing as interpretative a rule affecting prisoners' credit for time served), two cases that each involved a rule with an apparently substantial public impact.

7. The pre-Ruling ambiguity of the Seating System's proper classification is what distinguishes this case from *Linoz v. Heckler,* 800 F.2d 871 (9th Cir.1986), upon which OrthoConcepts relies heavily. In *Linoz,* the court considered a change to the *MCM* instructing carriers that coverage of ambulance trips to the "nearest hospital with appropriate facilities" did not include trips "solely to avail a patient of the service of … a physician in a specific specialty." *See id.* at 876. The *Linoz* court held that the limitation imposed by the new provision "withdrew coverage previously provided," *id.* at 877, therefore changing substantive law.

Unlike the rule in *Linoz,* which altered rather than clarified the coverage of ambulance trips, HCFAR 96–1 does not "carve[] out a per se exception" to a rule that previously contained no exceptions. *Id.* Instead, the Ruling explicates the view that the existing statutory and regulatory definitions place certain equipment in one existing category instead of another.

already outlined in the law itself." *Convaleciente,* 965 F.2d at 1178.

We find guidance in the Supreme Court's recent *Guernsey* decision. There, the Court considered whether the interpretative rule exemption applied to an accounting provision in HCFA's Provider Reimbursement Manual ("PRM"). Like HCFAR 96–1, the PRM provision at issue in *Guernsey* "[did] not purport to be a regulation and [had] not been adopted pursuant to the notice-and-comment procedures of the [APA]." 514 U.S. at 90, 115 S.Ct. 1232. The Court determined that the PRM provision concerned "[t]he only question unaddressed by the otherwise comprehensive regulations on this particular subject." *Id.* at 97, 115 S.Ct. 1232. The Court concluded that the measure "[was] a prototypical example of an interpretive rule" because the PRM provision merely applied existing law, *id.* at 99, 115 S.Ct. 1232, and was not "inconsistent with any of the Secretary's existing regulations," *id.* at 100, 115 S.Ct. 1232.

The reasoning in *Guernsey* applies here. The Medicare statute and regulations provide a comprehensive classification of equipment as DME or orthotics. The Ruling addresses a small overlap in this scheme. The answer the Ruling provides is consistent with the existing definitions. The statute and regulations define braces only by referring to particular types of braces, none of which would have to include a system of braces attached to a wheeled base. *See* 42 U.S.C. § 1395x(s)(9). But clearly the Seating System fits within one category or the other, so HCFA was acting in an interpretive, rather than legislative, capacity. *See United Technologies Corp. v. EPA,* 821 F.2d 714, 719–20 (D.C.Cir.1987) ("If the rule is based on specific statutory provisions, and its validity stands or falls on the correctness of the agency's interpretation of those provisions, it is an interpretative rule.").

By the same token, the Ruling is not inconsistent with existing law because the statutory and regulatory definitions of DME are broad enough to include the Seating System. It is conceded that the Seating System "[c]an withstand repeated use," 42 C.F.R. § 414.202, a principal regulatory criterion differentiating DME from other equipment.

Moreover, it is not inconsistent to treat the Seating System—which is, after all, a wheeled device in which a patient sits—as a customized wheelchair, a piece of equipment specifically identified as DME. *See* 42 U.S.C. § 1395x(n); 42 C.F.R. § 414.224. Nothing in any of the existing statutory or regulatory definitions is inconsistent with HCFAR 96–1. Together, the extant definitions were ambiguous in respect to the category within which the Seating System best fit, and "the quintessential example of an interpretive rule" is "[a] statement seeking to interpret a statutory or regulatory term." *Orengo Caraballo v. Reich,* 11 F.3d 186, 195 (D.C.Cir.1993).

■ OrthoConcepts' main contention both in the district court and on appeal was that HCFAR 96–1 was legislative because it changed HCFA's policy of reimbursing the Seating System as DME. This argument rests on erroneous views of both the law and the facts.

The legal point is clear enough: in order for notice and comment to be necessary, "the [later] rule would have to be inconsistent with another rule having the force of law, not just any agency interpretation regardless of whether it had been codified." *Chief Probation Officers v. Shalala,* 118 F.3d 1327, 1337 (9th Cir.1997) (White, J. (Retired, sitting by designation)). The Supreme Court in *Guernsey* intimated this much, concluding that the provision there was interpretive because it did not contradict "any of the Secretary's existing *regulations.*" 514 U.S. at 100, 115 S.Ct. 1232 (emphasis supplied); *see also id.* at 111, 115 S.Ct. 1232 (O'Connor, J., dissenting) (observing that interpretive rules "must explain existing law and not contradict what the [extant] regulations require"). The lower federal courts are in agreement on this score. *See, e.g., Orengo,* 11 F.3d at 196 (explaining that a subsequent rule is legislative "[o]nly where [the] second rule repudiates or is irreconcilable with [a prior legislative rule]"); *White v. Shalala,* 7 F.3d 296, 304 (2d Cir.1993) ("If the rule is an interpretation of a statute rather than an extrastatutory imposition of rights, duties or obligations, it remains interpretive even if the rule embodies the Secretary's changed interpretation of the statute."); *Davila,* 969 F.2d

at 492 ("[A]n agency's change in its reading of the statute does not necessarily make the rule announcing the change legislative."). As already stated, *see supra*, nothing in the statute or regulations addresses the precise issue decided in HCFAR 96–1. Thus, even supposing HCFA's pre-Ruling policy was different, the earlier policy would not prevent HCFA from adopting a contrary new interpretative rule.

However, we very much doubt that the Ruling, by limiting the coverage of braces to devices used independently of DME, added something new to HCFA's policies. In siding with OrthoConcepts, the district court concluded that the agency's informal pronouncements and practices regarding the reimbursement of the Seating System indicated a pre-Ruling policy to treat the Seating System as an orthotic. A number of factors, however, suggest the opposite conclusion.

First, the HCFA regional office's 1990 letter to OrthoConcepts specifically stated that the Seating System was DME. The district court disregarded this letter because a former OrthoConcepts attorney submitted an unsworn affidavit stating that the office promised to issue a letter rescinding the corresponding order instructing its carriers to treat the Seating System as DME. However, as the district court found, "there is no evidence that HCFA ever sent such a letter," nor is there any evidence corroborating the unsworn affidavit.

Second, HCFA instructed its carriers on three separate occasions that devices quite similar to the Seating System should be treated as DME. The first two memoranda, issued in 1987 and 1989, dealt with "contoured corrective seats," and concluded, as the 1989 memorandum put it, that the "only statutory provision that could apply to such equipment" was DME. The district court dismissed these memoranda on the ground that, by questioning whether the devices served a medical purpose, they relied on an alternative basis for denying the contoured corrective seats coverage. However, we cannot see how the inclusion of this complementary argument contradicts or negates the independent conclusion that the equipment at issue was DME.

A further manifestation of HCFA's earlier policy was its 1994 instruction to treat as DME equipment designated by the K-codes 0115 and 0116. The district court dismissed the 1994 instruction as "not directly on point," but the instruction set out a policy for equipment that, like the Seating System and the first illustration given in HCFAR 96–1, contained orthotic attachments. While the 1994 instruction addressed equipment with a different technical design, it implicitly contained the same principle as the Ruling: DME includes orthotic components that cannot be used independently of attached DME. That the 1994 instruction (as well as the 1987 and 1989 memoranda) did not address the precise equipment at issue here does not mean that HCFA had no relevant policy: "an interpretive statement may 'suppl[y] crisper and more detailed lines than the authority being interpreted.' " *Orengo,* 11 F.3d at 195 (quoting *American Mining Congress,* 995 F.2d at 1112). Thus, we reject OrthoConcepts' contention that HCFAR 96–1 effected a substantive change in the regulations.

■ As a fallback position, OrthoConcepts argues that HCFAR 96–1 could not be valid without notice-and-comment rulemaking because it has a binding effect on agency personnel. This argument confuses two senses in which a rule may bind. Of course, a rule with the force and effect of law—binding not only the agency and regulated parties, but also the courts—is by definition a substantive rule. However, a rule may lack this force and still bind agency personnel. Accordingly, "[a]n interpretive rule binds an agency's employees, including its ALJs, but it does not bind the agency itself." Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.3 at 104 (3d ed. 1996 & Supp.1997). In other words, a rule may be "binding" but not, for purposes of notice and comment, "substantive," or legislative. We rejected an argument almost identical to OrthoConcepts' in *Levesque:* "If plaintiffs mean that any rule that an agency intends to be effective must be legislative, they are plainly wrong. Every rule is intended to have some effect." 723 F.2d at 181–82; *see also American Mining Congress,* 995 F.2d at 1111 ("[R]estricting discre-

tion tells one little about whether a rule is interpretive."); *Davila,* 969 F.2d at 493 ("All rules which interpret the underlying statute must be binding because they set forth what the agency believes is congressional intent."). The fact that the Ruling binds HCFA carriers and ALJs is entirely consistent with its status as an interpretative rule.

We therefore reject OrthoConcepts' argument that HCFAR 96–1 was not legally adopted because of the absence of notice and comment procedures.

### 2. *Injunction*

■ The district court enjoined the Secretary from enforcing the Ruling and from denying OrthoConcepts' reimbursement for its Seating System under the braces benefit. It granted this relief based on the erroneous belief, *supra,* that HCFAR 96–1 was invalidly promulgated, leaving HCFA without an adequate basis for treating the Seating System as DME. As held above, however, HCFAR 96–1 was properly promulgated; we now further hold that the Ruling's interpretation of the Seating System as DME is adequately supported by the Medicare statute and regulations. We therefore vacate the injunction.

A threshold question is what deference is owed to an interpretative rule such as HCFAR 96–1. The Supreme Court has not expressed a view on whether or to what extent the *Chevron* framework, *see Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), applies to interpretive, rather than legislative rules, and other circuits are split on the issue.[8]

We need not decide the issue here because, even assuming *arguendo* that *Chevron* deference is not applicable to interpretative rules, we are persuaded that HCFAR 96–1 is an appropriate construction of the statute. We are guided in this regard by *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89

L.Ed. 124 (1944). There, the Court considered a rule that, having been issued by an agency not authorized to make legislative rules, was necessarily interpretative and without the force of law. *See id.* at 138, 65 S.Ct. 161. The Supreme Court approved the agency's interpretation and explained the proper approach to judicial review of interpretative rules:

> [T]he rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. at 140, 65 S.Ct. 161. Considering all of these factors, we think the interpretation embodied in HCFAR 96–1 is wholly supportable.

First, as already discussed, *see supra,* HCFAR 96–1 is generally consistent with HCFA's earlier informal pronouncements. *See Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 517 n. 13, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) (describing "scrutiny applicable to interpretive rules" as involving "due deference to consistent agency practice"). Hence to the extent that inconsistency with prior policies might lead us to find an interpretative rule arbitrary or capricious, we see no inconsistencies of such a nature.

Second, we find the Ruling to be a persuasive reading of the statute and HCFA's regulations. Those materials establish three criteria for classifying a device as DME: the item must be "durable," i.e., able to "withstand repeated use"; it must be reasonably

---

**8.** *Compare Trans Union Corp. v. FTC,* 81 F.3d 228, 230 (D.C.Cir.1996) ("[W]e have extended *Chevron* deference to agency interpretive rules ... indeed, the rule at issue in *Chevron* itself appears to have been interpretive."), *and Elizabeth Blackwell Health Ctr. for Women v. Knoll,* 61 F.3d 170 (3d Cir.1995) (equal deference), *and*

*Garcia v. Secretary of Health & Human Servs.,* 46 F.3d 552, 556 (6th Cir.1995) (same), *with Atchison, Topeka & Santa Fe Ry. Co. v. Pena,* 44 F.3d 437, 442 (7th Cir.1994) (en banc) (concluding that interpretive rules are "undeserving of deference under *Chevron* "); *see generally* Davis & Pierce, *supra,* § 3.5 (discussing ambiguity).

necessary "medical equipment"; and it must be "appropriate for use in the home." 42 U.S.C. § 1395x(n); 42 C.F.R. § 414.202. The Seating System meets each of these criteria, and OrthoConcepts advances no serious argument to the contrary.

Moreover, DME unequivocally includes "wheelchairs," *see* 42 U.S.C. § 1395x(n), and the Seating System serves the same (as well as additional) functions as a wheelchair. OrthoConcepts' own expert admitted that a casual observer might conclude that the product "looks like a wheelchair." HCFAR 96–1 also conforms to congressional intent as expressed in P.L. 101–508, § 4152(c)(4), the interim amendment to 42 U.S.C. § 1395m(a)(4) specifying that customized wheelchairs are DME. The legislative history of this provision shows that Congress intended DME to include "postural control devices" and "custom molded cushions and inserts, or lateral supports" associated with wheelchairs. H.R. No. 101–881, at 268 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2270. In short, it takes no great leap to conclude that congressional intent is well effectuated by treating the Seating System as DME.

Further support for HCFA's view is provided by the American Orthotic and Prosthetic Association, which has stated that the Seating System is a brace only when that term is used "in its most broad sense," and that the items are "more accurately described as a subset of orthoses called seating systems or wheeled mobility devices."

Even assuming that the entire device could alternatively be reasonably construed to satisfy the definition of a brace (which includes only examples of individual braces), there was nothing precluding HCFA from resolving the ambiguity in favor of DME. The district court concluded that equipment that could be categorized as both DME and an orthotic must be treated as an orthotic based on a portion of the *MCM*'s definition of DME that provides that "[t]here are other items which, although durable in nature, may [sic] fall into other coverage categories such as braces [and other categories]." *MCM* § 2000.1. We do not read this language as establishing DME as a category of last resort; it does not say, for instance, that *any*

equipment that could be classified as a brace is necessarily not DME. Instead, it uses the term "may," suggesting that the classification of equipment that is both brace-like and durable is left to HCFA. Accordingly, we do not accept OrthoConcepts' argument that HCFA had bound itself to resolve cases of ambiguity on the side of braces.

We also note that in establishing its policy, HCFA has been deliberate. HCFA has on multiple occasions met with OrthoConcepts' representatives, examined the equipment at issue, and given consideration to the statute and regulations as applied to the Seating System and comparable devices. HCFA's thoroughness belies OrthoConcepts' claim that HCFAR 96–1 is merely a litigating position entitled to no deference under *Smiley v. Citibank, N.A.*, 517 U.S. 735, 116 S.Ct. 1730, 1736, 135 L.Ed.2d 25 (1996).

Finally, the classification of medical equipment for reimbursement purposes is the sort of technical question that generally benefits from HCFA's expertise and experience. *See Stowell v. Secretary of Health & Human Servs.*, 3 F.3d 539, 544 (1st Cir.1993) (stating that "[c]ourts should not cavalierly discount the value of agency expertise painstakingly garnered in the administration, over time, of programs of remarkable intricacy" and citing cases); *Hospital San Jorge v. Secretary of Health, Educ. & Welfare*, 616 F.2d 580, 589 (1st Cir.1980) (Campbell, J., concurring) (stating that "[m]atters of [Medicare] accounting, unless they 'be the expression of a whim rather than an exercise of judgment,' are for the agency" (quoting *American Tel. & Tel. Co. v. United States*, 299 U.S. 232, 237, 57 S.Ct. 170, 81 L.Ed. 142 (1936))). Given HCFA's expertise in administering Medicare Part B, the logic of its interpretation, and the consistency of its policy, we conclude that the denial of claims for reimbursement of the Seating System under the brace benefit was not arbitrary or capricious, and thus withstands OrthoConcepts' challenge under 5 U.S.C. § 706(2)(A).

*The judgment of the district court is reversed and remanded with instruction to*

*vacate the injunction and to enter judgment for Appellants.*